# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 11, 2011          Decided September 13, 2011

No. 10-5163

NORTHEAST HOSPITAL CORPORATION,
APPELLEE

v.

KATHLEEN SEBELIUS, SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00180)

———

*Stephanie R. Marcus,* Attorney, U.S. Department of Justice, argued the cause for appellant. On the briefs were *Ronald C. Machen Jr.*, U.S. Attorney, *Anthony J. Steinmeyer*, Assistant Director, and *Jeffrica Jenkins Lee*, Attorney.

*Christopher L. Keough* argued the cause for appellee. With him on the brief were *J. Harold Richards* and *John M. Faust*.

*John R. Jacob* was on the brief for *amicus curiae* HCA, Inc., in support of appellee.

Before: GARLAND, GRIFFITH, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Opinion concurring in the judgment filed by *Circuit Judge* KAVANAUGH.

GRIFFITH, *Circuit Judge*: In a 2008 administrative appeal, the Secretary of Health and Human Services ruled that a Medicare beneficiary enrolled in Medicare Part C still qualifies as a person "entitled to benefits" under Medicare Part A. As a result, Beverly Hospital in Beverly, Massachusetts, received a smaller reimbursement from the Secretary for services it provided to low-income Medicare beneficiaries during fiscal years 1999-2002. The district court granted summary judgment for Beverly on the ground that the Secretary's interpretation violates the plain language of the Medicare statute. We conclude that the statute does not unambiguously foreclose the Secretary's interpretation. We nonetheless affirm the district court on the alternative ground that the Secretary must be held to the interpretation that guided her approach to reimbursement calculations during fiscal years 1999-2002, an interpretation that differs from the view she now advances. Under her previous approach, the hospital would have prevailed on its claim for a larger reimbursement.

I

A

The federal Medicare program reimburses medical providers for services they supply to eligible patients. *See generally* 42 U.S.C. § 1395 *et seq.* The Medicare statute is divided into five "Parts," four of which are relevant here. Part

A covers medical services furnished by hospitals and other institutional care providers. *See id.* §§ 1395c to 1395i-5. The Secretary makes payments under Part A directly to "providers of services," such as hospitals, rather than to managed care organizations, such as health maintenance organizations (HMOs). *See id.* §§ 1395f(a)-(b), 1395x(u). Part B is an optional supplemental insurance program that pays for medical items and services not covered by Part A, including outpatient physician services, clinical laboratory tests, and durable medical equipment. *See id.* §§ 1395j to 1395w-4. Anyone covered by Part A may purchase Part B insurance by paying a monthly premium. *See id.* §§ 1395j, 1395*o*.

Part C governs the "Medicare + Choice" (M+C) program, which gives Medicare beneficiaries an alternative to the traditional Part A fee-for-service system. *See id.* §§ 1395w-21 to 1395w-29. Under M+C, an individual may enroll with an HMO, preferred provider organization, or other private "managed care" plan. If a person enrolls in an M+C plan, the Secretary makes payments to the plan "instead of the amounts which (in the absence of the [M+C] contract) would otherwise be payable [to the provider] under [P]arts A and B," *id.* § 1395w-21(i)(1), and the plan in turn negotiates payment with the provider. Because M+C enrollees must purchase Part B coverage, *see id.* § 1395w-21(a)(3)(A), they tend to be wealthier than individuals who receive care under Part A. Part D, which is not relevant to this case, provides a prescription drug benefit program. *See id.* §§ 1395w-101 to 1395w-152.

Part E sets out various "Miscellaneous Provisions," one of which is the Prospective Payment System (PPS) for reimbursing Part A inpatient hospital services. *See id.* § 1395ww(d). Under the PPS, Medicare reimburses a hospital for services based on prospectively determined national and regional rates rather than on the actual amount the hospital

spends. *See id.* § 1395ww(d)(1)-(4). The PPS also provides for payment adjustments based on various hospital-specific factors. One such adjustment is the "disproportionate share hospital" (DSH) adjustment, under which the Secretary pays more for services provided by hospitals that "serve[] a significantly disproportionate number of low-income patients." *Id.* § 1395ww(d)(5)(F)(i)(I).

Whether a hospital qualifies for a Medicare DSH adjustment, and the amount of the adjustment the hospital receives, depends on the hospital's "disproportionate patient percentage." *Id.* § 1395ww(d)(5)(F)(v)-(vii). This percentage is a "proxy measure" for the number of low-income patients a hospital serves, H.R. REP. NO. 99-241, pt. 1, at 17 (1985), and represents the sum of two fractions, commonly called the "Medicare fraction" and the "Medicaid fraction." The Medicare fraction is:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under [Medicare] Part A . . . and were entitled to supplementary security income [SSI] benefits . . . and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under [Medicare] Part A . . . .

*Id.* § 1395ww(d)(5)(F)(vi)(I). The Medicaid fraction is:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State [Medicaid] plan . . . but who were not entitled to benefits

under [Medicare] Part A . . . and the denominator of which is the total number of the hospital's patient days for such period.

*Id.* § 1395ww(d)(5)(F)(vi)(II). Here is a visual representation of the two fractions:

|  | Medicare Fraction | Medicaid Fraction |
|---|---|---|
| Numerator | Patient days for patients "entitled to benefits under Part A" *and* "entitled to SSI benefits" | Patient days for patients "eligible for [Medicaid]" *but not* "entitled to benefits under Part A" |
| Denominator | Patient days for patients "entitled to benefits under Part A" | "Total number of patient days" |

A "fiscal intermediary," typically a private insurance company acting as the Secretary's agent, calculates DSH adjustments. *See* 42 C.F.R. §§ 421.1, 421.3, 421.100-.128. If a hospital is dissatisfied with the intermediary's determination, it may appeal to the Provider Reimbursement Review Board (PRRB), an administrative body appointed by the Secretary. *See* 42 U.S.C. § 1395*oo*(a), (h). The PRRB may affirm, modify, or reverse the fiscal intermediary's award; the Secretary in turn may affirm, modify, or reverse the PRRB's decision. *See id.* § 1395*oo*(d)-(f).

B

Northeast Hospital Corporation owns and operates Beverly Hospital, a Medicare provider in Beverly, Massachusetts. For fiscal years 1999-2002, the fiscal

intermediary excluded Beverly's M+C patient days from the numerator of the Medicaid fraction.

Northeast appealed to the PRRB, arguing that M+C patients eligible for Medicaid should be counted in the numerator of the Medicaid fraction because they are not "entitled to benefits" under Part A. Northeast claimed it was owed an additional $737,419 in Medicare payments as a result of the intermediary's improper calculation. The PRRB ruled against Northeast, holding that under the statute and implementing regulations, M+C patient days should not be counted in the Medicaid fraction because M+C beneficiaries remain "entitled to benefits under Part A" even after electing Part C. *Beverly Hosp. v. BlueCross BlueShield Ass'n*, PRRB Dec. No. 2008-D37, 2008 WL 7256679, at *4 (Sept. 23, 2008), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 82,112. The Secretary affirmed the PRRB's ruling. *Beverly Hosp. v. BlueCross BlueShield Ass'n*, Review of PRRB Dec. No. 2008-D37, 2008 WL 6468518 (Nov. 21, 2008), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 82,207.

Northeast filed suit in the district court challenging the Secretary's decision. In an opinion issued on March 30, 2010, the district court granted summary judgment for Northeast.[1] *Ne. Hosp. Corp. v. Sebelius*, 699 F. Supp. 2d 81 (D.D.C. 2010). In the district court's view, under the plain language of the statute, M+C patients eligible for Medicaid must be counted in the Medicaid fraction because M+C beneficiaries are no longer "entitled to benefits under Part A" once they elect Part C. *Id.* at 93. Counting M+C patients in the Medicaid fraction increases the size of the fraction and, in Northeast's case, the amount of the reimbursement to which it is entitled

---

[1] The district court also granted summary judgment for the Secretary on several issues not relevant to the present appeal.

for its care of low-income patients. We have jurisdiction over the Secretary's appeal under 28 U.S.C. § 1291.

## II

We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor. *Geleta v. Gray*, 645 F.3d 408, 410 (D.C. Cir. 2011). We review the Secretary's interpretation of the DSH provision, 42 U.S.C. § 1395ww(d)(5)(F)(vi), under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The *Chevron* inquiry has two steps. First, "we ask if the statute unambiguously forecloses the agency's interpretation." *Nat'l Cable & Telecomm. Ass'n v. FCC*, 567 F.3d 659, 663 (D.C. Cir. 2009). If it does, we "disregard the agency's view and 'give effect to the unambiguously expressed intent of Congress.'" *Id.* (quoting *Chevron*, 467 U.S. at 843). If, however, "the statute is ambiguous enough to permit the agency's reading," we defer to the agency's interpretation "so long as it is reasonable." *Id.*

The key interpretive question in this case is whether a person enrolled in an M+C plan is still "entitled to benefits under Part A." The Secretary says yes. Northeast argues that this interpretation is contrary to the plain language of the statute, is unreasonable, and in any case cannot be applied to Beverly's 1999-2002 DSH adjustments because during those years the Secretary took the position that M+C enrollees are *not* "entitled to benefits under Part A."

Before proceeding, it may be helpful to explain how the Secretary's interpretation results in lower DSH payments. If an M+C patient is entitled to benefits under Part A (the Secretary's interpretation), then his hospital days are counted in both the numerator of the Medicare fraction, if he is

entitled to SSI, and the denominator of that fraction. At the same time, the patient's days are not counted in the numerator of the Medicaid fraction, but *are* counted in the denominator of that fraction. If, on the other hand, an M+C patient is *not* entitled to benefits under Part A (Northeast's interpretation), then the patient's hospital days are not counted in either the numerator or the denominator of the Medicare fraction, but *are* counted in both the numerator of the Medicaid fraction, if he is eligible for Medicaid, and the denominator of that fraction.

Consider first the Medicare fraction. Including M+C patient days in the numerator and denominator of the fraction (the Secretary's interpretation) dilutes the fraction because M+C enrollees are less likely to qualify for SSI benefits than non–M+C enrollees. This is because to qualify for Part C a person must first purchase Part B coverage. *See* 42 U.S.C. § 1395w-21(a)(3)(A). That is, to qualify for Part C a person must have the means to afford Part B premiums. If M+C enrollees are less likely to qualify for SSI benefits than non–M+C enrollees, adopting the Secretary's interpretation and counting M+C patients among patients "entitled to benefits under Part A" reduces the percentage of patients entitled to benefits under Part A who also qualify for SSI. Northeast's interpretation has the opposite effect.

Consider now the Medicaid fraction. Adopting the Secretary's interpretation and counting M+C patients among patients "entitled to benefits under Part A" decreases the numerator of the fraction (all patients "eligible for [Medicaid]" *but not* "entitled to benefits under Part A") and has no effect on the denominator ("total number of patient[s]"), diluting the fraction. Northeast's interpretation again has the opposite effect. In sum, then, the Secretary's interpretation decreases the DSH adjustment that hospitals receive, while Northeast's interpretation has the opposite

effect. Nationwide, the practical consequences of this dispute number in the hundreds of millions of dollars.

## A

At *Chevron* step one we ask whether Congress has unambiguously foreclosed the Secretary's interpretation that M+C enrollees are "entitled to benefits under Part A." We conclude Congress has not, because numerous provisions in the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, which enacted M+C, as well as subsequent amendments to Part C, assume that a person enrolled in M+C remains entitled to benefits under Part A, and nothing in the text or structure of the DSH fractions compels a different result.[2]

The Secretary argues that the phrase "entitled to benefits under Part A" applies to all individuals who meet the statutory criteria in 42 U.S.C. § 426(a) and (b) for receiving "hospital insurance benefits under Part A." Under § 426(a), "[e]very individual who . . . has attained age 65" and "is entitled to monthly [Social Security benefits]" is "entitled to hospital insurance benefits under Part A." Under § 426(b), every

_____

[2] Our concurring colleague thinks our criticism of the district court's reasoning unnecessary in light of our conclusion that the Secretary cannot retroactively apply her interpretation to pre-2004 DSH calculations, Concurring Op. 7 n.3, but we commonly say why the district court erred before affirming on other grounds, *see, e.g.*, *Ginger v. District of Columbia*, 527 F.3d 1340, 1344-45 (D.C. Cir. 2008); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1040-41 (D.C. Cir. 1991). And considerations of judicial economy counsel strongly in favor of doing so here, where the district court is likely to confront the same difficult statutory interpretation question again in the near future.

individual under the age of 65 who meets certain disability, marital, or other criteria is similarly "entitled to hospital insurance benefits under Part A." According to the Secretary, M+C enrollees are a subset of these two groups, because to be eligible for Part C a person must first be entitled to benefits under Part A, *see* 42 U.S.C. § 1395w-21(a)(3)(A), and enrolling in Part C does not affect one's age, marital status, or ability to work. Thus, by definition M+C enrollees must be entitled to benefits under Part A.

Northeast counters that M+C enrollees *cannot* be "entitled" to benefits under Part A, because once a person enrolls in M+C, payments on his behalf are made under Part C, not Part A. Northeast points to three provisions. First, § 426(c)(1) states that "entitlement of an individual to hospital insurance benefits for a month [under Part A] shall consist of entitlement to have *payment* made under, and subject to the limitations in, [P]art A . . . on his behalf for inpatient hospital services" (emphasis added). *See also id.* § 1395d(a) ("The benefits provided to an individual by the insurance program under [Part A] shall consist of entitlement to have *payment* made on his behalf . . . for . . . inpatient hospital services . . . ." (emphasis added)). Second, § 1395w-21(a)(1), which was enacted as part of the original 1997 Act, states that persons eligible for Part C are "entitled to elect to receive benefits" either "through the original [M]edicare fee-for-service program under [P]arts A and B . . . *or* . . . through enrollment in a Medicare + Choice plan under [Part C]" (emphasis added). Third, § 1395w-21(i)(1), another 1997 Act provision, specifies that once a person enrolls in an M+C plan, Medicare payments to the plan "shall be *instead of* the amounts which (in the absence of the [M+C] contract) would otherwise be payable [to the provider] under [P]arts A and B" (emphasis added).

Northeast's logic is straightforward: "there is only one benefit provided under [P]art A," and that benefit is "the right to have *payment* made under [P]art A." Appellee's Br. 21. But individuals who enroll in an M+C plan do not receive benefits under Part A; rather, they receive benefits under Part C. According to Northeast, then, M+C enrollees cannot possibly be "entitled" to benefits under Part A, because they can no longer even *receive* benefits under Part A. Rather, they can only receive benefits under Part C. *See* 42 U.S.C. § 1395w-21(a)(1), (i)(1). Northeast's argument rests on the statute's plain meaning: a hospital patient is not "entitled" to benefits that the law denies him.

The trouble with Northeast's reasoning, however, is that elsewhere the 1997 Act assumes that a person who enrolls in an M+C plan is still "entitled to benefits under Part A." *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))). Section 1395w-21(a)(3)(A) states that a "Medicare + Choice eligible individual" is a person "who is entitled to benefits under [P]art A" and "enrolled under [P]art B." Under Northeast's reasoning, once a person elects Part C he is no longer "eligible" for Part C, because he is no longer "entitled to benefits under Part A" (because payments on his behalf are no longer made under Part A). Aside from the textual incongruity that would result from saying that once a person enrolls in Part C he is no longer "eligible" for it, neighboring Part C provisions make clear that a person remains a "Medicare + Choice eligible individual" even after enrolling in Part C.

Section 1395w-21(d)(2)(A), for instance, requires the Secretary to mail "each Medicare + Choice eligible individual" information about available Part C plans, including "[a] list identifying the Medicare + Choice plans that are (or will be) available to residents of the area," before the start of each annual open enrollment period. If M+C enrollees are no longer "eligible" for Part C once they enroll, this means the Secretary is not required to mail them this information, even though the purpose of the open enrollment period is to allow beneficiaries to change plans.

Our concurring colleague suggests it would not be strange at all if the Secretary did not have to mail Part C plan information to M+C enrollees, presumably because M+C enrollees already know about their Part C options. Concurring Op. 8. But Part C options change every year, which is undoubtedly why the Act requires the Secretary to update the information she sends out annually "to reflect changes in the availability of [M+C] plans and the benefits and . . . premiums for such plans." 42 U.S.C. § 1395w-21(d)(2)(D). Contrary to the concurrence's suggestion, then, it would be odd indeed if the Secretary were required to mail information to individuals not enrolled in Part C but *not* required to mail such information to persons who *are* enrolled in Part C. After all, M+C enrollees are the people most likely to be interested in annual changes to benefits and plan availability. That a neighboring provision also requires the Secretary to "provide for activities [that] broadly disseminate" information about Part C coverage options to Medicare beneficiaries, *id.* § 1395w-21(d)(1), does not eliminate the oddity Northeast's interpretation produces. "Broadly disseminating" information about Part C options is not the same as mailing plan information to every M+C enrollee, and if it were, § 1395w-

21(d)(2)'s mail-notification requirement would be superfluous.[3]

Northeast's interpretation would also produce the anomalous result that an M+C plan must provide general plan information "upon request" to non–M+C enrollees, but need not provide such information upon request to persons enrolled with a different M+C plan. *See id.* § 1395w-22(c)(2) (requiring "Medicare + Choice organization[s]" to provide "general coverage information and general comparative plan information" to "Medicare + Choice eligible individual[s]" upon request). But an M+C enrollee looking to change plans is likely to be just as interested in learning about his options as someone looking to join an M+C plan for the first time. It would make no sense for Congress to require plans to provide information upon request to the one but not the other, but that is the result Northeast's interpretation produces.

The concurrence says we claim that under Northeast's interpretation M+C enrollees "would not be able to obtain plan information from their Part C plans," and then points out a separate provision that requires plans to provide information

---

[3] The concurrence also argues that relying on the open-season notice provision to interpret the term "entitled to benefits under Part A" amounts to "using a very small tail to wag a very large dog." Concurring Op. 8. But as discussed *infra*, that is not the only provision that assumes a person who enrolls in Part C remains entitled to benefits under Part A. *See also* 42 U.S.C. § 1395w-21(a)(3)(A), (e)(2)(D), (h)(1); *id.* § 1395w-22(a)(7), (c)(2); *id.* § 1395w-23(*o*)(3)(B)(ii); *id.* § 1395w-24(e)(1)(B), (e)(4)(B); *id.* § 1395w-27(e); *id.* § 1395w-27a(f)(4)(A). And in any event, given that this case requires us to determine the relationship between enrollment in Part C and entitlement to Part A benefits, it makes sense to consider how that relationship plays out in other provisions.

to their own enrollees. Concurring Op. 9 (citing 42 U.S.C. § 1395w-22(c)(1)). This is a straw man. The problem with Northeast's interpretation is not that it would excuse M+C plans from providing information to their own enrollees. Rather, the problem is that it would require plans to provide information upon request to individuals not enrolled in M+C at all but *not* require plans to provide this information to individuals enrolled in M+C with a *different* plan. There is no reason why Congress would require plans to provide information to the former but not the latter.

Another provision that becomes odd under Northeast's interpretation is § 1395w-21(h)(1), which prohibits M+C plans from distributing marketing materials to "Medicare + Choice eligible individuals" unless the plans first submit the materials to the Secretary for review. Under Northeast's reading of the statute, plans would be unable to send unreviewed marketing materials to *non*–M+C enrollees but free to send such materials to individuals already in an M+C plan, because those individuals would no longer be "Medicare + Choice eligible individuals." This would make little sense: M+C enrollees are no less vulnerable to misleading marketing campaigns than individuals not enrolled in Part C.

Our concurring colleague says he finds nothing odd with requiring M+C plans to submit marketing materials to the Secretary for review before sending such materials to Medicare beneficiaries not enrolled in Part C. Concurring Op. 9. Nor do we: § 1395w-21(h)(1) requires as much. What we do find odd, however, is a provision that prohibits plans from sending unreviewed marketing materials to individuals not enrolled in M+C but permits them to send those same materials to M+C enrollees. The concurrence does not offer

any reason why Congress would treat enrollees and non-enrollees differently here, and we can think of none.

Last but not least are 42 U.S.C. § 1395w-24(e)(1)(B) and (e)(4)(B).[4] These provisions limit the average premiums, deductibles, and copayments M+C enrollees pay for certain benefits to the average amounts "individuals entitled to benefits under [P]art A . . . and enrolled under [P]art B" would pay for those same benefits "if they were not members of a Medicare + Choice organization for the year." These provisions assume it is possible to be both entitled to benefits under Part A and enrolled in an M+C plan.

Other Part C provisions enacted after the original 1997 Act also assume that a person who enrolls in an M+C plan is still "entitled to benefits under Part A." Although "[l]ater laws that do not seek to clarify an earlier enacted general term and do not depend for their effectiveness [on] . . . a change in the meaning of the earlier statute" are normally "beside the point," *United States v. Monzel*, 641 F.3d 528, 536 (D.C. Cir. 2011) (quoting *Gutierrez v. Ada*, 528 U.S. 250, 257-58 (2000)) (internal quotation marks omitted), we find subsequently enacted Part C provisions relevant in this case because they inform the relationship between Part C

---

[4] Our concurring colleague makes much of the fact that we mention several provisions the Secretary did not cite in her briefs. *See* Concurring Op. 9-11. "Under *Chevron*'s first step, however, we have a duty to conduct an 'independent examination' of the statute in question, looking not only 'to the particular statutory language at issue,' but also to 'the language and design of the statute as a whole,'" including provisions "not relied on" by the parties. *Martini v. Fed. Nat'l Mortg. Ass'n*, 178 F.3d 1336, 1345-46 (D.C. Cir. 1999) (quoting *N.Y. Shipping Ass'n v. Fed. Maritime Comm'n*, 854 F.2d 1338, 1355 (D.C. Cir. 1988); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)) (internal citations omitted).

enrollment and Part A entitlement, *see Branch v. Smith*, 538 U.S. 254, 281 (2003) (plurality opinion) ("[I]t is, of course, the most rudimentary rule of statutory construction . . . that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes . . . ."); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 269-70 (1998) (Scalia, J., dissenting) (arguing that Congress's "expressed understanding" of what a phrase means "is surely evidence that it is fairly possible to read the provision that way" (internal quotation marks omitted)); *Griffith v. Lanier*, 521 F.3d 398, 402 (D.C. Cir. 2008) ("[W]e read a body of statutes addressing the same subject matter *in pari materia* . . . including later-enacted statutes as well."). And these subsequently enacted provisions confirm that "entitled to benefits under Part A" is a term of art that can encompass M+C enrollees.

Section 1395w-21(e)(2)(D), for example, provides that an institutionalized "Medicare + Choice eligible individual" may "change the Medicare + Choice plan in which the individual is enrolled." The provision *assumes* that a person may enroll in an M+C plan and yet still remain a "Medicare + Choice eligible individual." But under Northeast's reasoning an M+C enrollee could never be a "Medicare + Choice eligible individual," because he is no longer entitled to benefits under Part A.

Our concurring colleague responds by arguing that Northeast's interpretation would still allow institutionalized M+C enrollees to switch plans. Concurring Op. 10. But this response misses the point. The problem is not that Northeast's interpretation would prevent institutionalized M+C enrollees from changing plans, but rather that § 1395w-21(e)(2)(D) describes a person who is both "enrolled" in an M+C plan and

a "Medicare + Choice eligible individual," a combination the concurrence says is impossible.

Another provision that assumes an individual who enrolls in Part C may remain a "Medicare + Choice eligible individual" is § 1395w-23(*o*)(3)(B)(ii), which defines the term "qualifying county" for purposes of an annual benchmark computation as, *inter alia*, a county in which "at least 25 percent" of "[Medicare + Choice] eligible individuals" were "enrolled in [M+C] plans" for the year. Like § 1395w-21(e)(2)(D), this provision clearly contemplates that a person may be both "eligible" for and "enrolled" in Part C, but under Northeast's interpretation that could never be the case.

Two more provisions relevant to this point are §§ 1396d(p)(1) and 1395w-22(a)(7).[5] Section 1396d(p)(1) provides that a person "entitled to hospital insurance benefits under [P]art A" who meets certain income requirements is a "qualified [M]edicare beneficiary," while § 1395w-22(a)(7) instructs that a "qualified [M]edicare beneficiary . . . who is enrolled in a specialized [M+C] plan for special needs individuals" may not be charged costs above a certain amount. Read together, these provisions expressly contemplate a person who is both "entitled to benefits under Part A" and enrolled in Part C, something Northeast says is impossible.

The concurrence's response to this analysis again misses the point. The problem is not, as the concurrence suggests, that Northeast's interpretation would cause Medicare rather than Medicaid to pay for low-income M+C enrollees. *See*

---

[5] Section 1396d(p)(1) is not located in Part C of the Medicare statute, but is relevant here because it defines a key term in § 1395w-22(a)(7), which *is* located in Part C of the Medicare statute.

Concurring Op. 10. Rather, the problem is that these two provisions, when read together, describe a person who is simultaneously enrolled in an M+C plan and entitled to benefits under Part A, something Northeast's interpretation does not allow.

Yet another provision that makes no sense under Northeast's interpretation is § 1395w-27(e), which authorizes the Secretary to charge fees to M+C plans to help recoup the costs of distributing information about Part C options, among other things. *See* 42 U.S.C. § 1395w-27(e)(2)(B). For fiscal years 2001-2005, such fees could not exceed "the Medicare + Choice portion (as defined in [§ 1395w-27(e)(2)(E)]) of $100,000,000." *Id.* § 1395w-27(e)(2)(D)(ii)(IV). That paragraph, in turn, defines "Medicare + Choice portion" as "(i) the average number of individuals enrolled in Medicare + Choice plans during the fiscal year," divided by "(ii) the average number of individuals entitled to benefits under [P]art A . . . and enrolled under [P]art B . . . during the fiscal year." Under Northeast's interpretation, if more than 50 percent of individuals eligible to enroll in Part C do so, then this fraction exceeds a value of 1, because Northeast's interpretation deletes M+C enrollees from the denominator (because under Northeast's interpretation M+C enrollees are no longer entitled to benefits under Part A). Let's plug in some numbers. Suppose there are 50 million people entitled to benefits under Part A and enrolled in Part B (and thus eligible to enroll in Part C), and 30 million of them enroll in Part C. The fraction would then equal: 30 million / (50 million – 30 million) = 30 million / 20 million = 1.5. That would in turn make the "Medicare + Choice portion of $100,000,000" equal: $100,000,000 * 1.5 = $150,000,000. Obviously the "Medicare + Choice portion" of a dollar amount cannot equal

a sum greater than the original dollar amount. Here again, Northeast's interpretation leads to a nonsensical result.[6]

Rather than attempting to show why the fraction still works under Northeast's interpretation, our concurring colleague instead raises a red herring. How can we say Northeast's interpretation produces a nonsensical result for this fraction for fiscal years 2001-2005, he asks, when we also hold that the Secretary must apply Northeast's interpretation to pre-2004 DSH calculations to avoid retroactivity problems? *See* Concurring Op. 11. But the issue before us is not whether the Secretary acted reasonably before 2004, when she may have interpreted "entitled to benefits under Part A" to include M+C enrollees under § 1395w-27(e)(2)(E) but to exclude those enrollees in the DSH calculations, and we express no opinion as to whether interpreting that phrase inconsistently would be permissible. *Compare IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."), *with Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) ("[T]he 'natural presumption that identical words used in different parts of the same act are intended to have the same meaning . . . is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with

---

[6] Under the Secretary's interpretation, however, the fraction works perfectly because a person entitled to benefits under Part A does not lose that entitlement when he enrolls in Part C. That is, the denominator of the fraction is unaffected by enrollments in Part C. Suppose again that there are 50 million people eligible to enroll in Part C and 30 million of them do. The fraction would then equal: 30 million / 50 million = .6. That would in turn make the "Medicare + Choice" portion of $100,000,000 equal: $100,000,00 * .6 = $60,000,000.

different intent.'" (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932))). Here, we need only say that § 1395w-27(e)(2)(E) shows that the Medicare statute sometimes uses the phrase "entitled to benefits under Part A" in a way that encompasses M+C enrollees, which supports our conclusion that the statute does not unambiguously foreclose the Secretary's current interpretation. Whether the Secretary can *enforce* that interpretation against Northeast for the period before 2004 is a separate question that we address below.

Finally, § 1395w-27a(f)(4)(A) instructs the Secretary to determine annually a "statutory national market share percentage" that equals "the proportion of [Medicare + Choice] eligible individuals nationally who were not enrolled in an [M+C] plan." If M+C enrollees are not entitled to benefits under Part A and thus not "Medicare + Choice eligible individuals," then the proportion of "Medicare + Choice eligible individuals" not enrolled in an M+C plan is always 100 percent. Surely Congress did not mean to tell the Secretary to annually calculate a number that is always equal to 1. Northeast's interpretation makes this provision nonsense.

We are thus faced with two inconsistent sets of statutory provisions. Northeast points us to provisions that tie entitlement to payment and state that once a person enrolls in Part C, payments are no longer made under Part A. The Secretary points us to other provisions that assume it is possible to be both entitled to benefits under Part A and enrolled in Part C. Under these circumstances, we conclude that the Medicare statute does not unambiguously foreclose the Secretary's interpretation.

Nothing about the DSH provision itself compels a different result. Our concurring colleague emphasizes that the

DSH fractions "require[] HHS to focus retrospectively on specific patient days." Concurring Op. 3; *see* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (counting "patient days . . . which were made up of patients who (for such days) were entitled to benefits under [P]art A"); *id.* § 1395ww(d)(5)(F)(vi)(II) (counting "patient days . . . which consist of patients who (for such days) were eligible for medical assistance under a State [Medicaid] plan . . . but who were not entitled to benefits under [P]art A"). But this does not prove that Congress unambiguously intended "entitled" to mean "paid." Moreover, the fractions' focus on specific patient days works perfectly well under the Secretary's view that "entitled" means "meeting the statutory criteria in § 426(a) and (b)." Not every patient who meets the criteria in those paragraphs during some portion of his hospital stay will meet those criteria for all of the stay. For instance, a person who collects Social Security and who turns 65 during his hospital stay will become "entitled" to benefits under Part A on his sixty-fifth birthday. *See* 42 U.S.C. § 426(a). Or, a person under age 65 who reaches his twenty-fifth calendar month of entitlement to disability benefits under § 423 during his hospital stay will become "entitled" to benefits under Part A upon reaching his twenty-fifth month of disability entitlement. *See id.* § 426(b). That Congress tied the DSH calculation to individual days of entitlement does not foreclose the Secretary's interpretation.

Nor is the fact that the DSH fractions speak of "eligibility" for Medicaid but "entitlement" to Medicare enlightening. *See id.* § 1395ww(d)(5)(F)(vi)(II) (stating that the numerator of the Medicaid fraction "consist[s] of" patients "eligible" for Medicaid but not "entitled" to benefits under Part A). Northeast argues that Congress's disparate use of these two words indicates it intended "entitled" to mean something different from "eligible" and that the Secretary's interpretation of "entitled" as "meeting the statutory criteria

for entitlement" conflates the terms. *See Pillsbury v. United Eng'g Co.*, 342 U.S. 197, 199 (1952) (identifying presumption that Congress means different things when it uses different words, especially when "the two words are used in the same sentence").

But the Secretary's interpretation does not actually collapse the terms. Section 1395i-2(a) provides that individuals who have reached age 65, are enrolled in Part B, and are lawful U.S. residents but are "not otherwise entitled to benefits" under Part A, "shall be eligible to enroll in the insurance program established by [Part A]." Similarly, § 1395i-2a(a) provides that individuals who have not reached age 65 and are not "otherwise entitled to benefits" under Part A but who meet certain other criteria "shall be eligible to enroll" in Part A. Both provisions further specify that after such persons enroll in Part A they become "entitled to benefits" under Part A during their period of enrollment. *See* 42 U.S.C. §§ 1395i-2(a), 1395i-2a(c)(1). Thus, even under the Secretary's view that "entitled to benefits" means "meeting the statutory criteria for entitlement to benefits," it is possible to be "eligible" for, but not "entitled" to, Part A benefits because one has not yet "enrolled" in the program.

Moreover, the usual rule that Congress intends different meanings when it uses different words has little weight here. As Judges Luttig and Batchelder both recognized in an earlier line of DSH cases, "Congress has, throughout the various Medicare and Medicaid statutory provisions, consistently used the words 'eligible' to refer to potential Medicaid beneficiaries and 'entitled' to refer to potential Medicare beneficiaries for no reason whatever that anyone (including the Secretary, who is intimately familiar with the statutes . . .) has been able to divine." *Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 992 (4th Cir. 1996) (Luttig, J.,

dissenting); *see also Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 278 (6th Cir. 1994) (Batchelder, J., dissenting).[7] To the extent Congress was merely borrowing

---

[7] In this earlier line of DSH cases, four circuits concluded that the terms "eligible" and "entitled" as used in the DSH provision carry different meanings. *See Cabell Huntington Hosp.*, 101 F.3d at 988 (majority opinion) ("Congress chose the word entitled for the Medicare proxy and the word eligible for the Medicaid proxy. Congress' use of separate words demonstrates it intended for each to have a separate meaning."); *see also Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996); *Deaconess Health Servs. Corp. v. Shalala*, 83 F.3d 1041, 1041 (8th Cir. 1996) (per curiam); *Jewish Hosp.*, 19 F.3d at 275 (majority opinion). Indeed, not only did these circuits conclude that the terms carry different meanings, but they also interpreted "entitled to benefits" to mean that a person has a *right to have payment made*. *See Jewish Hosp.*, 19 F.3d at 275 ("To be *entitled* to some benefit means that one possesses the *right* or *title* to that benefit. Thus, the Medicare [fraction] *fixes* the calculation upon the absolute right to receive an independent and readily defined payment."); *see also Legacy Emanuel Hosp.*, 97 F.3d at 1265; *cf. Cabell Huntington Hosp.*, 101 F.3d at 988. We decline to follow these cases for three reasons. First, the meaning of the phrase "entitled to benefits under Part A" was not directly at issue in any of the cases. Rather, the issue was whether the Secretary had properly interpreted the phrase "eligible for [Medicaid]" to include only patient days that were actually paid by a state Medicaid plan, an interpretation the Secretary abandoned in 1997. Health Care Fin. Admin. Ruling 97-2 (Feb. 27, 1997). The interpretations of "entitled to benefits" in these cases were therefore dicta. Second, the cases were all decided before Part C was enacted and so spoke of entitlement to payment under Medicare generally without reference to the particular "Part" under which payment would occur. Third, the cases failed to grapple with Judge Luttig's and Judge Batchelder's observations that Congress has, for no readily apparent reason, chosen to use the word "eligible" for Medicaid beneficiaries and "entitled" for Medicare beneficiaries.

these terms from elsewhere in the statute, it would be a mistake to read too much into the difference in nomenclature. The terms *might* carry different meanings here, but the inference is weak.

Given the Medicare statute's inconsistent and specialized use of the phrase "entitled to benefits under Part A," the concurrence's appeal to "[c]ommon parlance" has little force. Concurring Op. 7. Although a typical M+C enrollee might not describe himself as "entitled to benefits under Part A," a person familiar with the Medicare statute's varying and inconsistent uses of that phrase might. Statutes "addressed to specialists . . . must be read by judges with the minds of specialists," Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 536 (1947), and few provisions are more specialized than the ones at issue here, which the Fourth Circuit once described as "among the most completely impenetrable texts within human experience," *Rehab. Ass'n of Va. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994).

In sum, Congress has not clearly foreclosed the Secretary's interpretation that M+C enrollees are entitled to benefits under Part A. Rather, it has left a statutory gap, and it is for the Secretary, not the court, to fill that gap. *See Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009) (per curiam).

B

At *Chevron* step two we ask whether the agency's interpretation of the statute is "reasonable." *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 719 (D.C. Cir. 2009). In this case, however, we do not reach that question, because even if the Secretary's present

interpretation is reasonable, it cannot be applied retroactively to fiscal years 1999-2002.

It is well settled that an agency may not promulgate a retroactive rule absent express congressional authorization. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Rulemaking, moreover, "includes not only the agency's process of formulating a rule, but also the agency's process of modifying a rule." *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999); *see also* 5 U.S.C. § 551(5) ("'[R]ule making' means agency process for formulating, amending, or repealing a rule[.]"); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997) ("Under the APA, agencies are obliged to engage in notice and comment before formulating regulations, which applies as well to 'repeals' or 'amendments.'" (emphasis omitted)). Thus, the rule against retroactive rulemaking applies just as much to amendments to rules as to original rules themselves.

To determine whether a rule is impermissibly retroactive, "we first look to see whether it effects a substantive change from the agency's prior regulation or practice." *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002). If the rule departs from established practice, we then examine its impact, if any, on the legal consequences of prior conduct. A rule that "alter[s] the *past* legal consequences of past actions" is retroactive; a rule that alters only the "future effect" of past actions, in contrast, is not. *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) (quoting *Bowen*, 488 U.S. at 219 (Scalia, J., concurring)) (internal quotation marks omitted). Put differently, "[i]f a new rule is 'substantively inconsistent' with a prior agency practice and attaches new legal consequences to events completed before

its enactment, it operates retroactively." *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).

The Secretary's present interpretation stems from a 2004 rulemaking in which she said she was "adopting a policy" of counting M+C days in the Medicare fraction because M+C enrollees "are still, in some sense, entitled to benefits under . . . Part A." 69 Fed. Reg. 48,916, 49,099 (Aug. 11, 2004). Accordingly, the Secretary revised 42 C.F.R. § 412.106, the HHS regulation that governs calculation of DSH fractions, to state expressly that M+C patient days should be counted in the Medicare fraction.[8] *See* 42 C.F.R. § 412.106(b)(2) (2007) (providing that a hospital's Medicare fraction is determined by dividing "the number of patient days . . . furnished to patients who . . . were entitled to both Medicare Part A (or Medicare Advantage (Part C)) and SSI" by "the total number of days . . . furnished to patients entitled to Medicare Part A (or Medicare Advantage (Part C))"). Prior to 2004, the regulation did not specify where M+C enrollees should be counted. *See id.* § 412.106(b)(2) (2003) (providing that a hospital's Medicare fraction is determined by dividing "the number of covered patient days . . . furnished to patients who . . . were entitled to both Medicare Part A and SSI" by "the total number of patient days . . . furnished to patients entitled to Medicare Part A").

The Secretary argues that just because she amended § 412.106 to state explicitly that M+C days should be counted in the Medicare fraction does not mean she omitted M+C days prior to the amendment. *See Baptist Mem'l Hosp.– Golden Triangle v. Sebelius*, 566 F.3d 226, 229 (D.C. Cir.

---

[8] Because of a clerical error, the text of § 412.106 was not actually revised until 2007. *See* 72 Fed. Reg. 47,130, 47,384 (Aug. 22, 2007) (explaining that the failure to change the text in 2004 was "inadvertent[]").

2009) ("[W]hen a legislative or executive body adopts a new clarifying law or rule, it does not necessarily follow that an earlier version did not have the same meaning."). Rather, she says, the amendment merely confirmed her longstanding view that M+C days should be included in the Medicare fraction because M+C enrollees are still "entitled to benefits under Part A."

A brief look at the Secretary's treatment of M+C days prior to 2004, however, belies her claim that the revision to § 412.106 codified a longstanding policy. In two recent PRRB hearings, providers submitted evidence based on hundreds of cost reports from numerous hospitals that between 1999 and 2004, the Secretary routinely *excluded* M+C days from the Medicare fraction. *See Sw. Consulting DSH Medicare + Choice Days Grps. v. BlueCross BlueShield Ass'n*, PRRB Dec. No. 2010-D52, 2010 WL 4211391, at *12 (Sept. 30, 2010), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 82,679 (reviewing evidence that from 1999 to 2004, the Secretary "never count[ed] M+C days in the [Medicare] fraction except rarely, and then by mistake"), *rev'd*, Review of PRRB Dec. No. 2010-D52, 2010 WL 5571037 (Nov. 22, 2010), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 82,703; *see also Sw. Consulting DSH SSI Grp. Appeals v. BlueCross BlueShield Ass'n*, PRRB Dec. No. 2010-D48, 2010 WL 4211376, at *9 (Sept. 24, 2010), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 82,675. The intermediary did not challenge the evidence in either hearing, *see Sw. Consulting DSH Medicare + Choice*, 2010 WL 4211391, at *12; *Sw. Consulting DSH SSI*, 2010 WL 4211376, at *10, and the PRRB expressly stated in its decision on the second hearing that it "[found] the evidence persuasive that [the Secretary's] actual practice was to not count the M+C days in the [Medicare] fraction prior to 2004," *Sw. Consulting DSH Medicare + Choice*, 2010 WL 4211391, at *12.

Moreover, in 1998, the year after Congress enacted M+C, the Secretary instructed non-teaching hospitals *not* to file "no-pay" bills for services furnished to M+C patients. *See* Program Memorandum (Intermediaries), HCFA Pub. 60A, Transmittal No. A-98-21 (July 1, 1998). According to Northeast, the Secretary needs these bills to count M+C days in the Medicare fraction, and the Secretary does not claim otherwise. Perhaps for this reason, in 2007 the Secretary reversed course and directed *all* hospitals to begin submitting "no-pay" bills for M+C patients. Change Request 5647, CMS Pub. 100-04, Transmittal No. 1331 (July 20, 2007). It further appears that prior to 2004, the Secretary was not even *using* the data field for managed care days in the program file for calculating Medicare fractions. *See Baystate Med. Ctr. v. Mut. of Omaha Ins. Co.*, PRRB Dec. No. 2006-D20, 2006 WL 752453, at *31 (Mar. 17, 2006), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 81,468 ("[HHS's hospital inpatient database] programmer . . . testified that the field on [the database] for HMO days 'hasn't been used since the time that I started running the [database in 1995].'"). According to the PRRB, this means such days "could not have been included in the [Medicare] fraction in any case, even if a no-pay bill had been submitted." *Id.*

The Secretary admits that she routinely failed to count M+C patient days in the Medicare fraction prior to 2004, but attributes this failure to "errors in [HHS's] data systems" that she says have now been resolved. Reply Br. 26. Thus, she claims, "the failure to count the days was not intentional, and [hence] not consistent with any alleged prior policy." *Id.* at 27. The Secretary's explanation is not convincing. As just described, in 1998 she instructed non-teaching hospitals *not* to submit information that she needed to count M+C days in the Medicare fraction, and between at least 1995 and 2004 she did not even *use* the managed care field in the hospital

inpatient database. The failure to count M+C days in the Medicare fraction was not the result of data system errors.

Aside from the Secretary's actual treatment of M+C days, her statements in the 2004 rulemaking and in a subsequent 2007 technical revision confirm that she changed her interpretation of the DSH provision in 2004. As noted above, in the 2004 rulemaking she announced that she was "adopting a policy" of counting M+C days in the Medicare fraction. 69 Fed. Reg. at 49,099. And in a 2007 technical revision to § 412.106 that made changes she had inadvertently omitted three years earlier, she called her 2004 decision to include M+C days in the Medicare fraction a "policy change." 72 Fed. Reg. 47,130, 47,384 (Aug. 22, 2007).

The Secretary does not even attempt to reconcile these statements with her claim that her present position is "longstanding." Rather, she points to a 1990 rulemaking in which she stated that "HMO" days should be counted in the Medicare fraction. *See* 55 Fed. Reg. 35,990, 35,994 (Sept. 4, 1990) ("Based on the language of [§ 1395ww(d)(5)(F)(vi)], which states that the disproportionate share adjustment computation should include 'patients who were entitled to benefits under Part A,' we believe it is appropriate to include the days associated with Medicare patients who receive care at a qualified HMO. . . . Therefore, since [December 1987], we have been including HMO days in [the Medicare] percentage."). Prior to enactment of M+C in 1997, Medicare payments to HMOs were governed under § 1395mm, which provided for two types of contracts: (1) "cost" contracts, under which the Secretary reimbursed an HMO for its reasonable costs; and (2) "risk" contracts, under which the Secretary made fixed monthly payments to the HMO. 42 U.S.C. § 1395mm(a), (g), (h); *see also* 42 C.F.R. §§ 417.530-.576 (cost contracts), 417.580-.598 (risk contracts). As with

M+C, Medicare payments for HMO patients went to the managed care plan, which then paid the provider, rather than to the provider directly. *See* 42 U.S.C. § 1395mm(a)(6) ("Subject to [certain exceptions] . . . if an individual is enrolled under this section with an eligible organization having a risk-sharing contract, only the eligible organization shall be entitled to receive payments from the Secretary under this subchapter for services furnished to the individual.").

The Secretary argues that the 1990 rulemaking shows she has long interpreted the Medicare fraction to include managed care days and has never limited the calculation to reimbursements paid directly to hospitals under Part A. Again, however, her actual practice belies this claim. At least as early as 1995, she was not using the managed care field in the program file for calculating Medicare fractions, making it impossible to count HMO days in the Medicare fraction. *See Baystate Med. Ctr.*, 2006 WL 752453, at *31. Moreover, even if the 1990 rulemaking accurately reflected the Secretary's policy regarding § 1395mm HMO days, M+C was not enacted until 1997. *See* Balanced Budget Act § 4001, 111 Stat. at 275-327 (codified at 42 U.S.C. § 1395w-21 *et seq.*). Any support the 1990 rulemaking provides the Secretary's argument is thus indirect at best. This contrasts with the evidence about the Secretary's treatment of M+C days *during the fiscal years in dispute*.

In light of the foregoing, it is apparent that the Secretary's decision to apply her present interpretation of the DSH statute to fiscal years 1999-2002 violates the rule against retroactive rulemaking. The Secretary's interpretation, as set forth in the 2004 rulemaking and resulting amendment to § 412.106, contradicts her former practice of excluding M+C days from the Medicare fraction. Moreover, the amendment attaches new legal consequences to hospitals' treatment of

low-income patients during the relevant time period. Hospitals that serve a disproportionately large number of such patients receive a statutorily mandated "additional payment" from the Secretary, 42 U.S.C. § 1395ww(d)(5)(F)(i), and whether a particular hospital qualifies for this payment, and the size of the payment the hospital receives, depends on the hospital's DSH fractions. Any rule that alters the method for calculating those fractions, therefore, changes the legal consequences of treating low-income patients.

We are aware of no statute that authorizes the Secretary to promulgate retroactive rules for DSH calculations. Absent such authorization, the Secretary's present interpretation, which marks a substantive departure from her prior practice of excluding M+C days from the Medicare fraction, may not be retroactively applied to fiscal years 1999-2002.

C

We are puzzled by the concurrence's suggestion that we have "twisted [ourselves] into a knot" by holding, on the one hand, that the DSH provision does not unambiguously foreclose the Secretary's interpretation that M+C enrollees are entitled to benefits under Part A, while also holding, on the other hand, that the Secretary cannot retroactively apply her interpretation to pre-2004 DSH calculations. Concurring Op. 13. The concurrence points out that none of the problems we identify above surfaced while the Secretary took the view Northeast now urges. But the Secretary avoided those problems by reading the phrase "entitled to benefits under Part A" to mean different things in different places. *See* 63 Fed. Reg. 34,968, 34,979 (June 26, 1998) (describing Secretary's practice of interpreting "entitled" to mean different things in different provisions). How the Secretary read other provisions before 2004 is not before us, and is

irrelevant to the disposition in this case. We express no opinion as to whether the Secretary must read the phrase "entitled to benefits under Part A" to always mean the same thing throughout the Medicare statute. For present purposes, it is enough to conclude that other provisions of the Medicare statute make clear that the phrase sometimes includes M+C enrollees and that nothing in the DSH provision compels a different result.

## III

As we conclude our analysis, a passage from Learned Hand lamenting the complexity of another regulatory behemoth—the Internal Revenue Code—comes to mind:

> I know that these [provisions] are the result of fabulous industry and ingenuity . . . yet at times I cannot help recalling a saying of William James about certain passages of Hegel: that they were no doubt written with a passion of rationality; but that one cannot help wondering whether to the reader they have any significance save that the words are strung together with syntactical correctness. Much of the law is now as difficult to fathom, and more and more of it is likely to be so; for there is little doubt that we are entering a period of increasingly detailed regulation, and it will be the duty of judges to thread the path . . . through these fantastic labyrinths.

Learned Hand, *In Memoriam: Thomas Walter Swan*, 57 YALE L.J. 167, 169 (1947). Having wound our way through the intricate tangle of DSH fractions, Medicare + Choice requirements, and more, we hold that Congress has not unambiguously foreclosed the Secretary's interpretation that M+C enrollees are entitled to benefits under Part A. But we also hold that the Secretary's present interpretation, even if it

would pass *Chevron* step two (an issue upon which we do not opine), may not be retroactively applied to Beverly's 1999-2002 DSH adjustments. We affirm the district court's grant of summary judgment for Northeast for this second reason.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring in the judgment:

Although the legal question presented here is embedded within a very complex legal scheme and has significant financial ramifications, the question itself is straightforward: If a hospital patient receives Medicare benefits under Medicare Part C for a particular "patient day," is that patient also "entitled" for that same "patient day" to Medicare benefits under Medicare Part A? In my view, the text of the Medicare statute tells us the answer is no. I agree with the careful analysis by Judge Bates in the District Court: Medicare beneficiaries must choose between government-subsidized private insurance plans under Part C and government-administered insurance under Part A, and after they choose, they are obviously not entitled on the same "patient day" to benefits from both kinds of plans. HHS rejected that interpretation of the text and, as a result, significantly undercompensated Beverly Hospital (and many other hospitals) for the costs of treating Medicare patients. Because HHS misapplied the statute, I would rule for Beverly Hospital and affirm the judgment of the District Court on that ground.

I

Through the Medicare program, the Federal Government provides health insurance to, among others, Americans who are 65 or older. Medicare has several "parts," two of which are central to this case: Part A provides hospitalization benefits through government-administered fee-for-service hospital insurance, and Part C (previously called "Medicare+Choice" and now called "Medicare Advantage") provides government-subsidized enrollment in private insurance plans.

The Department of Health and Human Services manages Medicare Part A by paying hospitals a pre-determined sum for

each covered inpatient hospitalization service, without regard to the actual cost incurred by the hospitals. HHS is required by statute to disburse extra Part A funds to hospitals that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). The theory is that, for a variety of reasons, it costs hospitals more to treat significant numbers of low-income patients, and hospitals that do so should therefore receive higher reimbursements. A statutory provision known as the "disproportionate share hospital adjustment" provides a convoluted (to put it charitably) formula for calculating how much extra money HHS must pay to hospitals that disproportionately serve the poor. The formula is designed to measure the proportion of low-income patients at a given hospital for a particular cost-reporting period.

Without delving into too much numbing detail, it suffices here to say that the statutory calculation relevant to this case requires a determination for each hospital of the number of patient days "made up of patients who (for such days) were entitled to benefits under part A of [Medicare]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

Beverly Hospital treated a disproportionately high number of low-income patients during fiscal years 1999 through 2002, and therefore was due to receive extra payments for doing so. The Hospital challenges HHS's calculation of those payments. The Hospital contends that HHS, when applying the formula, improperly counted patients enrolled in Medicare Part C as patients "entitled to benefits under part A," even though Medicare Part C recipients do not receive benefits under Part A. According to the Hospital, HHS's misinterpretation of that component of the statutory formula caused the agency to undercompensate the Hospital.

This case boils down to a straightforward question of statutory interpretation: If a person is enrolled in and receives hospitalization benefits for a particular "patient day" through a Medicare+Choice plan pursuant to Part C of Medicare, is that person also "entitled" for that same "patient day" to hospitalization "benefits under part A" of Medicare? In other words, can a patient be both enrolled in Part C and entitled to Part A benefits *for the same day*? The answer is no.

Four mutually reinforcing textual points support that conclusion.

*First*, the language of the key statutory provision requires HHS to focus retrospectively on specific patient days. To reiterate, the statute requires HHS to calculate the number of patient days "made up of patients who (*for such days*) were entitled to benefits under part A." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added). The words "for such days" in the statute make clear that HHS must count specific hospital days for patients who, on those specific days, were entitled to Part A benefits. The word "were" makes clear that this is a backward-looking calculation designed to determine what kind of benefits a specific patient received on a specific day. The statute requires HHS to isolate hospital days attributable to patients who were, on those days, receiving benefit payments through Part A of Medicare. A patient who is receiving benefits under Part A for a given day cannot also receive benefits under Part C for that day. Therefore, in calculating the formula, HHS is required to differentiate Part-C-attributable patient days from Part-A-attributable patient days.

*Second*, the Medicare statute establishes that "each Medicare+Choice eligible individual . . . is entitled to elect to receive benefits . . . through the original [M]edicare fee-for-

service program under parts A and B . . . , *or* . . . through enrollment in a Medicare+Choice plan under [part C]." 42 U.S.C. § 1395w-21(a)(1) (emphasis added). In other words, a Medicare recipient makes a choice between the different parts of Medicare for purposes of obtaining Medicare coverage. The statute indicates that a patient cannot be enrolled in Part A and Part C at the same time. Once the Medicare recipient chooses a part and enrolls, he or she becomes entitled to benefits under that part, and only under that part. Even though a Part-C-enrolled patient maintains the right to cancel enrollment in Part C and switch to Part A (or vice versa) in a future open enrollment period, on any given day the patient is entitled to hospitalization benefits under only the part of Medicare in which he or she is currently enrolled. A Medicare patient enrolled in Part C on a particular day is therefore entitled to receive benefits under Part C, and not under Part A, for that day. Similarly, a Medicare patient enrolled in Part A on a particular day is entitled to receive benefits under Part A, and not under Part C, for that day.

*Third*, the Medicare statute provides that "payments under a contract with a Medicare+Choice organization . . . with respect to an individual electing a Medicare+Choice plan offered by the organization shall be *instead of* the amounts which (in the absence of the contract) would otherwise be payable under [Medicare] parts A and B." 42 U.S.C. § 1395w-21(i)(1) (emphasis added). All Part C enrollees could, if they chose, be enrolled in Part A instead. Section 1395w-21(i)(1) establishes that HHS makes benefit payments under Part C *instead of* payments the agency would otherwise make under Part A, and that Part C enrollees receive Part C benefit payments *instead of* Part A benefit payments. As a result, a patient enrolled in Part C on a particular day does not receive benefit payments under Part A for that day.

5

*Fourth*, the Medicare statute defines "entitlement" to Part A benefits as follows: "entitlement of an individual to [Medicare part A] benefits for a month shall consist of entitlement to have payment made under, and subject to the limitations in, [Medicare] part A . . . during such month." 42 U.S.C. § 426(c)(1). In other words, "entitlement" is not just an abstract ability to sign up for Part A or Part C. Rather, it is entitlement *to have payment made*, and a patient at any given time can have payment made under Part A or Part C but not both. Put another way, a Medicare patient enrolled in a Part C plan does *not* have the right "to have payment made under, and subject to the limitations in, [Medicare] part A."[1]

That interpretation of "entitlement" as meaning entitlement to be paid is consistent, moreover, with the decisions of the four courts of appeals that have previously interpreted that term in this formula. *See Cabell Huntington Hosp. v. Shalala*, 101 F.3d 984 (4th Cir. 1996); *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir. 1996); *Deaconess Health Svcs. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996); *Jewish Hosp. v. Sec'y of HHS*, 19 F.3d

---

[1] HHS rejects this interpretation of the word "entitled" in the phrase "entitled to benefits under part A," but accepts the same interpretation in the phrase "entitled to supplemental security income benefits," even though both phrases are found in the same sentence of the statute. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) ("patients who (for such days) were entitled to benefits under part A . . . and were entitled to supplemental security income benefits"); 75 Fed. Reg. 50,042, 50,280-81 (Aug. 16, 2010) (patients are "entitled" to SSI benefits only when they actually receive SSI payments). HHS thus interprets the word "entitled" differently within the same sentence of the statute. The only thing that unifies the Government's inconsistent definitions of this term is its apparent policy of paying out as little money as possible. I appreciate the desire for frugality, but not in derogation of law.

270 (6th Cir. 1994).[2] As the Sixth Circuit explained in the first of this line of cases, to be "entitled" to some benefit means that "one possesses the right or title to that benefit." *Jewish Hosp.*, 19 F.3d at 275 (emphasis omitted). The phrase "entitled to benefits under part A" thus "fixes the calculation upon the absolute right to receive an independent and readily defined payment." *Id.* (emphasis omitted); *see also Legacy Emanuel*, 97 F.3d at 1265 ("Both parties agree that the Medicare proxy only counts patient days paid by Medicare."); *cf. Cabell Huntington*, 101 F.3d at 988 ("a patient who is 'eligible' for Medicaid becomes 'entitled' to payment only after using one of the covered medical services").

Although it's not binding on HHS, a recent decision of HHS's own Provider Reimbursement Review Board also persuasively supports the Hospital's interpretation here. In a straightforward opinion, the Board reasoned that "once an individual has enrolled in a Medicare+Choice plan under part C, he or she is no longer 'entitled to benefits under part A,' because he or she is no longer entitled to have payment made under part A for the days at issue." *Southwest Consulting DSH Medicare+Choice Day Groups v. BlueCross BlueShield Ass'n NHIC Corp.*, PRRB Dec. No. 2010-D52 at 12, *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 82,679 (Sept. 30, 2010), *rev'd*, CMS Adm'r Dec. (Nov. 22, 2010).

And of course, it is quite telling that, until 2004, HHS itself interpreted the statute as the Hospital does here. In 2004, HHS abruptly changed course, apparently because of an overriding desire to squeeze the amount of money paid to

---

[2] Those courts were focused on a different phrase in the statute – "eligible for" Medicaid rather than "entitled to" Medicare – but had occasion to discuss the meaning of "entitled to" Medicare as contrasted with "eligible for" Medicaid.

Medicare providers (and beneficiaries) in light of the country's increasingly precarious fiscal situation. But this statute does not permit HHS to pursue fiscal balance on the backs of Medicare providers and beneficiaries in this way.

Common parlance and common sense also are consistent with the Hospital's interpretation of the text. For example, an active-duty member of the military is not permitted to speak at a political rally. You might be entitled to serve in the military, and you might be entitled to speak at political rallies. But you are not entitled to do both at the same time. When a retiree elects a pension benefit when retiring, the retiree is entitled to choose an annuity or a lump sum, but not both. Or consider the NFL's rules on the coin toss: If you win the toss, you are entitled to choose possession or which goal to defend, but not both. So it is with Part A and Part C of Medicare.

II

The majority opinion does not directly take issue with any of the above textual analysis showing that, for purposes of § 1395ww(d)(5)(f)(vi), a Part C beneficiary is not "entitled" to Part A benefits for a specific patient day.[3] According to the majority opinion, the Hospital's interpretation of "entitled" nonetheless cannot be accepted because it would cause problems for or anomalies in the implementation of certain other statutory provisions. And those problems or anomalies show, the majority opinion says, that the Hospital's interpretation of § 1395ww(d)(5)(f)(vi) is not correct. I

---

[3] Part II.A of the majority opinion rejects the Hospital's *Chevron* step one argument, but then Part II.B of the majority opinion rules for the Hospital anyway because HHS had a different position back before 2004. Part II.A of the majority opinion thus is unnecessary given the majority opinion's conclusion.

disagree with the majority opinion's bank-shot approach to interpreting § 1395ww(d)(5)(f)(vi).

A

The majority opinion cites § 1395w-21(d)(2)(A), a provision that requires annual notice to Part A beneficiaries (those "entitled" to benefits under Part A) of their option to enroll in Part C. *See* Maj. Op. at 12. The majority opinion expresses concern that, under the Hospital's approach, this provision might not require notice to Part C enrollees. That concern is misplaced because HHS puts all of the relevant information on its website and in practice notifies both Part A and Part C beneficiaries of their available options. That's presumably because a different subsection of this provision requires that HHS "broadly disseminate information to medicare beneficiaries (and prospective medicare beneficiaries) on the coverage options provided under this section in order to promote an active, informed selection." 42 U.S.C. § 1395w-21(d)(1). The apparent point of the precise statutory notice requirement in subsection (d)(2)(A) is simply to ensure that *non-Part C* individuals learn about Part C options, which is precisely what would still be required under the Hospital's interpretation. In short, contrary to the majority opinion's suggestion, subsection (d)(2)(A) creates no barrier to the Hospital's interpretation.

Probably more important in the bigger picture here, the majority opinion's reliance on the relatively minor open-season notice provision to interpret the hugely significant statutory reimbursement formula, which involves hundreds of millions of dollars annually, amounts to using a very small tail to wag a very large dog. Even if the Hospital's interpretation would create an anomaly (as the majority opinion sees it) in the open-season notice provision, that anomaly would be

inconsequential, as explained above, and in any event would not be a good reason to rewrite the statutory text of the reimbursement formula and thereby shift responsibility for hundreds of millions of dollars in costs from the government to hospitals and Medicare beneficiaries.

Next, citing § 1395w-22(c)(2), the majority opinion suggests that Part C enrollees would not be able to obtain plan information from their Part C plans under the Hospital's interpretation. *See* Maj. Op. at 13. HHS did not rely on this statutory provision in its brief, and for good reason. The preceding subsection, § 1395w-22(c)(1), requires Part C plans to give similar information to all of their Part C enrollees. The difference in language between §§ 1395w-22(c)(1) and 1395w-22(c)(2) actually *supports* the Hospital's approach here.

Next, the majority opinion cites § 1395w-21(h)(1). *See* Maj. Op. at 14. This is another provision that HHS has not relied upon. In any event, this provision, too, does not cause any problems if applied only to non-Part C enrollees. Under the Hospital's interpretation, the provision would require HHS's approval before Part C plans send marketing materials to Medicare beneficiaries who are not yet signed up for such a Part C plan. Contrary to the majority opinion, I find nothing odd about that.

The majority opinion then turns to § 1395w-24(e)(1)(B) and (e)(4)(B). *See* Maj. Op. at 15. Again, the majority opinion has dredged up statutory provisions that HHS has declined to rely on. (HHS was well-represented in this case, so the majority opinion is not making up for deficiencies of counsel. Rather, it is citing provisions that even HHS – which has been dealing with this issue for years – has not relied upon.) I frankly see no anomaly with respect to these

provisions that would result from the Hospital's interpretation. What those provisions mean quite simply and quite obviously is that Part C enrollees cannot be forced to pay more than Part A and Part B beneficiaries for the same benefits.

The majority opinion cites § 1395w-21(e)(2)(D) and claims that the Hospital's interpretation would mean that an institutionalized Part C patient could not change plans. *See* Maj. Op. at 16. But an institutional patient who dropped his Part C plan would then be entitled to Part A benefits and thus eligible to sign up for a different Part C plan. So there's no problem or anomaly there.

The majority opinion cites § 1395w-23(*o*)(3)(B)(ii), a provision about qualifying counties. *See* Maj. Op. at 17. This, too, is yet another provision that HHS has not cited. I again fail to see the confusion the majority opinion thinks would be created here if we accepted the Hospital's interpretation. It is quite clear that the determination of qualifying counties examines whether 25% of those in a particular area who could sign up for Medicare Part C did sign up for Medicare Part C.

The majority opinion points to § 1396d(p)(1) and says that the Hospital's interpretation would cause Medicare rather than Medicaid to pay for poor Part C patients. *See* Maj. Op. at 17. (Medicaid typically pays for the hospital expenses of poor Medicare patients.) Putting aside the fact that there are relatively few poor Part C patients, a separate statutory provision, § 1395w-22(a)(7), makes abundantly clear that Medicaid and not Medicare will pick up the costs for such patients. So the majority opinion's far-afield citation to § 1396d(p)(1) does not pose any barrier to or inconsistency with the Hospital's interpretation of the term "entitled" in the

statutory reimbursement formula contained in 42 U.S.C. § 1395ww(d)(5)(F)(vi).

The majority opinion also cites § 1395w-27(e). *See* Maj. Op. at 18-19. Here, the majority opinion is on particularly shaky ground. This statute sets forth a formula that allowed HHS to collect fees from Part C plans, subject to certain caps, for fiscal years 2001 to 2005. The problem is that the majority opinion here has *accepted* the Hospital's interpretation of this statute for the years before 2004. The majority opinion thus blesses the Hospital's interpretation for fiscal years 2001, 2002, and 2003 and yet says simultaneously that the Hospital's interpretation would create a "nonsensical result" with respect to § 1395w-27(e)(2)(B), which applies to those same years. Maj. Op. at 19. How can that be?

The majority opinion then cites § 1395w-27a(f)(4)(A). *See* Maj. Op. at 20. This is still another provision that the majority opinion cites but HHS did not. And this provision likewise does not cause any problems under the Hospital's interpretation. Indeed, the majority opinion's attempt to create confusion about this provision appears severely strained in context (which is probably why HHS did not cite it). This provision in context asks a simple question: How many people in the area could have signed up for Part C but didn't?

B

To summarize the prior discussion: The majority opinion has cited a series of statutory provisions on the theory that the Hospital's interpretation of § 1395ww(d)(5)(F)(vi) – that a Part C beneficiary is not entitled to Part A benefits for a particular patient day – would cause anomalies in other provisions of the statute. But there are no such anomalies. Neither in isolation nor in combination do those provisions

undermine the straightforward interpretation of § 1395ww(d)(5)(F)(vi) advanced by the Hospital and accepted by the District Court.[4]

Moreover, there is a serious overarching problem with the majority opinion's approach that is perhaps easier to explain.

The majority opinion confidently proclaims that the Hospital's interpretation, if accepted, would apply to a host of other provisions and cause problems or "nonsensical" results with respect to everything from open-season notices to caps on hospitals' payments for the costs of counseling programs. But then, the majority opinion turns around and says that the Hospital's interpretation actually controls for the years up until 2004. How can both things be true? How can the majority opinion endorse – at least for all the years up until 2004 – the same "nonsensical" results that it simultaneously decries?

I think the explanation is that the majority opinion has vastly overblown the supposed inconsistencies that the Hospital's interpretation would cause with respect to other

---

[4] In response to my opinion, the majority opinion raises doubt about the Hospital's interpretation of the statute but declines to say whether HHS's interpretation of the statute is permissible. *See* Maj. Op. at 24 ("we do not reach that question"). In D.C. Circuit parlance, the majority opinion leaves open the possibility that HHS's interpretation might fail at *Chevron* step two. From my perspective, HHS's interpretation violates the statute, whether at *Chevron* step one or *Chevron* step two. In any event, it's important to underscore that this critical statutory question remains open, at least under *Chevron* step two analysis, for resolution in future cases that involve reimbursement for the years after 2004 – that is, for the years after the years at issue in this case and after HHS adopted its current interpretation of the statute.

statutory provisions. Indeed, it is plain that the majority opinion's concerns are misplaced because there is a historical record against which to check its dire predictions of "nonsensical" and "strange" and "odd" results. As the majority opinion says, HHS itself accepted the Hospital's interpretation until 2004. Yet HHS, while accepting the Hospital's interpretation of § 1395ww(d)(5)(F)(vi), managed to implement the rest of the statutory provisions cited by the majority opinion without any apparent confusion or meltdown. I am not aware of – and the majority opinion certainly cites no – "nonsensical" or "strange" or "odd" results that occurred before 2004 with respect to those other provisions. So it turns out that the majority opinion is wrong in saying that the Hospital's interpretation, if accepted, would cause tumult in other parts of the statute.

By attempting to say that the Hospital's interpretation (i) was controlling until 2004 and (ii) cannot be right because of all the "nonsense" that would ensue, the majority opinion has twisted itself into a knot. The way to untie the knot, in my respectful view, is to recognize that the Hospital's interpretation not only was controlling until 2004 but is correct even now. At a bare minimum, the majority opinion cannot plausibly rely on the supposed anomalies that the Hospital's interpretation would cause for other provisions of the statute and simultaneously endorse the Hospital's interpretation for the pre-2004 years.

\*    \*    \*

The majority opinion says that the Medicare statute is complicated. True enough. But the question here concerns a specific provision, not the entire Medicare code. Complexity in the code as a whole does not mean ambiguity in a specific provision. No one can fault the majority opinion's time and

effort in examining this statute. But the fact that it takes a while to figure out the meaning of a specific statutory provision based on its text and context is not the same as ambiguity. What matters for the *Chevron* analysis is not how long it takes to climb the statutory mountain; what matters is whether the view is sufficiently clear at the top. Here, despite HHS's effort to fog it up, § 1395ww(d)(5)(F)(vi) is sufficiently clear in establishing that a Part C beneficiary is not simultaneously entitled to benefits under Part A for any specific patient day.

The Medicare statute provides a very specific, carefully reticulated formula for calculating supplemental payments to hospitals that serve a disproportionate number of low-income Medicare patients. By counting patients enrolled in Part C plans as "entitled to benefits under part A" for specific patient days, HHS misapplied the statute and undercompensated Beverly Hospital. On that ground, I would affirm the District Court's decision to vacate and remand this matter to HHS.