(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AZAR, SECRETARY OF HEALTH AND HUMAN SERVICES *v.* ALLINA HEALTH SERVICES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 17–1484.　Argued January 15, 2019—Decided June 3, 2019

The Medicare program offers additional payments to institutions that serve a "disproportionate number" of low-income patients. 42 U. S. C. §§1395ww(d)(5)(F)(i)(I). These payments are calculated in part using what is called a hospital's "Medicare fraction." The fraction's denominator is the time the hospital spent caring for patients who were "entitled to benefits under" Medicare Part A, while the numerator is the time the hospital spent caring for Part-A-entitled patients who were also entitled to income support payments under the Social Security Act. §1395ww(d)(5)(F)(vi)(I). Congress created Medicare Part C in 1997, leading to the question whether Part C enrollees should be counted as "entitled to benefits under" Part A when calculating a hospital's Medicare fraction. Respondents claim that, because Part C enrollees tend to be wealthier than Part A enrollees, counting them makes the fraction smaller and reduces hospitals' payments considerably. In 2004, the agency overseeing Medicare issued a final rule declaring that it would count Part C patients, but that rule was later vacated after hospitals filed legal challenges. In 2013, it issued a new rule prospectively readopting the policy of counting Part C patients. In 2014, unable to rely on either the vacated 2004 rule or the prospective 2013 rule, the agency posted on its website the Medicare fractions for fiscal year 2012, noting that they included Part C patients. A group of hospitals, respondents here, sued. They claimed, among other things, that the government had violated the Medicare Act's requirement to provide public notice and a 60-day comment period for any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services," §1395hh(a)(2). The

court of appeals ultimately sided with the hospitals.

*Held*: Because the government has not identified a lawful excuse for neglecting its statutory notice-and-comment obligations, its policy must be vacated. Pp. 5–17.

(a) This case turns on whether the government's 2014 announcement established or changed a "substantive legal standard." The government suggests the statute means to distinguish a substantive from an *interpretive* legal standard and thus tracks the Administrative Procedure Act (APA), under which "substantive rules" have the "force and effect of law," while "interpretive rules" merely "advise the public of the agency's construction of the statutes and rules which it administers," *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, ___. Because the policy of counting Part C patients in the Medicare fractions would be treated as interpretive rather than substantive under the APA, the government submits, it had no statutory obligation to provide notice and comment before adopting the policy.

The government's interpretation is incorrect because the Medicare Act and the APA do not use the word "substantive" in the same way. First, the Medicare Act contemplates that "statements of policy" *can* establish or change a "substantive legal standard," §1395hh(a)(2), while APA statements of policy are *not* substantive by definition but are grouped with and treated as interpretive rules, 5 U. S. C. §553(b)(A). Second, §1395hh(e)(1)—which gives the government limited authority to make retroactive "substantive change[s]" in, among other things, "interpretative rules" and "statements of policy"—would make no sense if the Medicare Act used the term "substantive" as the APA does, because interpretive rules and statements of policy—and any changes to them—are *not* substantive under the APA by definition. Third, had Congress wanted to follow the APA in the Medicare Act and exempt interpretive rules and policy statements from notice and comment, it could have simply cross-referenced the exemption in §553(b)(A) of the APA. And the fact that Congress did cross-reference the APA's neighboring good cause exemption found in §553(b)(B), see §1395hh(b)(2)(C), strongly suggests that it "act[ed] intentionally and purposefully in the disparate" decisions, *Russello* v. *United States*, 464 U. S. 16, 23. Pp. 5–12.

(b) The Medicare Act's text and structure foreclose the government's position in this case, and the legislative history presented by the government is ambiguous at best. The government also advances a policy argument: Requiring notice and comment for Medicare interpretive rules would be excessively burdensome. But courts are not free to rewrite clear statutes under the banner of their own policy concerns, and the government's argument carries little force even on its own terms. Pp. 13–16.

Syllabus

(c) Because this Court affirms the court of appeals' judgment under §1395hh(a)(2), there is no need to address that court's alternative holding that §1395hh(a)(4) independently required notice and comment. Nor does this Court consider the argument, not pursued by the government here, that the policy did not "establis[h] or chang[e]" a substantive legal standard—and so did not require notice and comment under §1395hh(a)(2)—because the statute itself required the government to count Part C patients in the Medicare fraction. Pp. 16–17.

863 F. 3d 937, affirmed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GINSBURG, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. BREYER, J., filed a dissenting opinion. KAVANAUGH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–1484

### ALEX M. AZAR, II, SECRETARY OF HEALTH AND HUMAN SERVICES, PETITIONER *v.* ALLINA HEALTH SERVICES, ET AL.

#### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 3, 2019]

JUSTICE GORSUCH delivered the opinion of the Court.

One way or another, Medicare touches the lives of nearly all Americans. Recognizing this reality, Congress has told the government that, when it wishes to establish or change a "substantive legal standard" affecting Medicare benefits, it must first afford the public notice and a chance to comment. 42 U. S. C. §1395hh(a)(2). In 2014, the government revealed a new policy on its website that dramatically—and retroactively—reduced payments to hospitals serving low-income patients. Because affected members of the public received no advance warning and no chance to comment first, and because the government has not identified a lawful excuse for neglecting its statutory notice-and-comment obligations, we agree with the court of appeals that the new policy cannot stand.

## I

Today, Medicare stands as the largest federal program after Social Security. It spends about $700 billion annually to provide health insurance for nearly 60 million aged or disabled Americans, nearly one-fifth of the Nation's popu-

lation.  Needless to say, even seemingly modest modifications to the program can affect the lives of millions.

As Medicare has grown, so has Congress's interest in ensuring that the public has a chance to be heard before changes are made to its administration.  As originally enacted in 1965, the Medicare Act didn't address the possibility of public input.  Nor did the notice-and-comment procedures of the Administrative Procedure Act apply.  While the APA requires many other agencies to offer public notice and a comment period before adopting new regulations, it does not apply to public benefit programs like Medicare.  5 U. S. C. §553(a)(2).  Soon enough, though, the government volunteered to follow the informal notice-and-comment rulemaking procedures found in the APA when proceeding under the Medicare Act.  See *Clarian Health West, LLC* v. *Hargan*, 878 F. 3d 346, 356–357 (CADC 2017).

This solution came under stress in the 1980s.  By then, Medicare had grown exponentially and the burdens and benefits of public comment had come under new scrutiny.  The government now took the view that following the APA's procedures had become too troublesome and proposed to relax its commitment to them.  See 47 Fed. Reg. 26860–26861 (1982).  But Congress formed a different judgment.  It decided that, with the growing scope of Medicare, notice and comment should become a matter not merely of administrative grace, but of statutory duty.  See §9321(e)(1), 100 Stat. 2017; §4035(b), 101 Stat. 1330–78.

Notably, Congress didn't just adopt the APA's notice-and-comment regime for the Medicare program.  That, of course, it could have easily accomplished in just a few words.  Instead, Congress chose to write a new, Medicare-specific statute.  The new statute required the government to provide public notice and a 60-day comment period (twice the APA minimum of 30 days) for any "rule, requirement, or other statement of policy (other than a

national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]."　42 U. S. C. §1395hh(a)(2).

Our case involves a dispute over this language. Since Medicare's creation and under what's called "Medicare Part A," the federal government has paid hospitals directly for providing covered patient care. To ensure hospitals have the resources and incentive to serve low-income patients, the government has also long offered additional payments to institutions that serve a "disproportionate number" of such persons. §1395ww(d)(5)(F)(i)(I). These payments are calculated in part using a hospital's so-called "Medicare fraction," which asks how much of the care the hospital provided to Medicare patients in a given year was provided to *low-income* Medicare patients. The fraction's denominator is the time the hospital spent caring for patients who were "entitled to benefits under" Medicare Part A. The numerator is the time the hospital spent caring for Part-A-entitled patients who were *also* entitled to income support payments under the Social Security Act. §1395ww(d)(5)(F)(vi)(I). The bigger the fraction, the bigger the payment.

Calculating Medicare fractions got more complicated in 1997. That year, Congress created "Medicare Part C," sometimes referred to as Medicare Advantage. Under Part C, beneficiaries may choose to have the government pay their private insurance premiums rather than pay for their hospital care directly. This development led to the question whether Part C patients should be counted as "entitled to benefits under" Part A when calculating a hospital's Medicare fraction. The question is important as a practical matter because Part C enrollees, we're told, tend to be wealthier than patients who opt for tradi-

tional Part A coverage. *Allina Health Services* v. *Price*, 863 F. 3d 937, 939 (CADC 2017). So counting them makes the fraction smaller and reduces hospitals' payments considerably—by between $3 and $4 billion over a 9-year period, according to the government. Pet. for Cert. 23.

The agency overseeing Medicare has gone back and forth on whether to count Part C participants in the Medicare fraction. At first, it did not include them. See *Northeast Hospital Corp.* v. *Sebelius*, 657 F. 3d 1, 15–16 (CADC 2011). In 2003, the agency even proposed codifying that practice in a formal rule. 68 Fed. Reg. 27208. But after the public comment period, the agency reversed field and issued a final rule in 2004 declaring that it would begin counting Part C patients. 69 Fed. Reg. 49099. This abrupt change prompted various legal challenges from hospitals. In one case, a court held that the agency couldn't apply the 2004 rule retroactively. *Northeast Hospital*, 657 F. 3d, at 14. In another case, a court vacated the 2004 rule because the agency had "'pull[ed] a surprise switcheroo'" by doing the opposite of what it had proposed. *Allina Health Services* v. *Sebelius*, 746 F. 3d 1102, 1108 (CADC 2014). Eventually, and in response to these developments, the agency in 2013 issued a new rule that prospectively "readopt[ed] the policy" of counting Part C patients. 78 Fed. Reg. 50620. Challenges to the 2013 rule are pending.

The case before us arose in 2014. That's when the agency got around to calculating hospitals' Medicare fractions for fiscal year 2012. When it did so, the agency still wanted to count Part C patients. But it couldn't rely on the 2004 rule, which had been vacated. And it couldn't rely on the 2013 rule, which bore only prospective effect. The agency's solution? It posted on a website a spreadsheet announcing the 2012 Medicare fractions for 3,500 hospitals nationwide and noting that the fractions included Part C patients.

That Internet posting led to this lawsuit. A group of hospitals who provided care to low-income Medicare patients in 2012 argued (among other things) that the government had violated the Medicare Act by skipping its statutory notice-and-comment obligations. In reply, the government admitted that it hadn't provided notice and comment but argued it wasn't required to do so in these circumstances. Ultimately, the court of appeals sided with the hospitals. 863 F. 3d, at 938. But in doing so the court created a conflict with other circuits that had suggested, if only in passing, that notice and comment wasn't needed in cases like this. See, *e.g.*, *Via Christi Regional Medical Center, Inc.* v. *Leavitt*, 509 F. 3d 1259, 1271, n. 11 (CA10 2007); *Baptist Health* v. *Thompson*, 458 F. 3d 768, 776, n. 8 (CA8 2006). We granted the government's petition for certiorari to resolve the conflict. 585 U. S. \_\_\_ (2018).

## II

This case hinges on the meaning of a single phrase in the notice-and-comment statute Congress drafted specially for Medicare in 1987. Recall that the law requires the government to provide the public with advance notice and a chance to comment on any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services." §1395hh(a)(2). Before us, everyone agrees that the government's 2014 announcement of the 2012 Medicare fractions governed "payment for services." It's clear, too, that the government's announcement was at least a "statement of policy" because it "le[t] the public know [the agency's] current . . . adjudicatory approach" to a critical question involved in calculating payments for thousands of hospitals nationwide. *Syncor Int'l Corp.* v. *Shalala*, 127 F. 3d 90, 94 (CADC 1997). So whether the government had an obligation to provide notice and comment winds up turning on whether its 2014 announcement established or

changed a "substantive legal standard." That phrase doesn't seem to appear anywhere else in the entire United States Code, and the parties offer at least two ways to read it.

The hospitals suggest the statute means to distinguish a substantive from a *procedural* legal standard. On this account, a substantive standard is one that "creates duties, rights and obligations," while a procedural standard specifies how those duties, rights, and obligations should be enforced. Black's Law Dictionary 1281 (5th ed. 1979) (defining "substantive law"). And everyone agrees that a policy of counting Part C patients in the Medicare fraction is substantive in this sense, because it affects a hospital's right to payment. From this it follows that the public had a right to notice and comment before the government could adopt the policy at hand. 863 F. 3d, at 943.

Very differently, the government suggests the statute means to distinguish a substantive from an *interpretive* legal standard. Under the APA, "substantive rules" are those that have the "force and effect of law," while "interpretive rules" are those that merely "'advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, \_\_\_–\_\_\_ (2015) (slip op., at 2–3). On the government's view, the 1987 Medicare notice-and-comment statute meant to track the APA's usage in this respect. And the government submits that, because the policy of counting Part C patients in the Medicare fractions would be treated as interpretive rather than substantive under the APA, it had no statutory obligation to provide notice and comment before adopting its new policy.

Who has the better reading? Several statutory clues persuade us of at least one thing: The government's interpretation can't be right. Pretty clearly, the Medicare Act doesn't use the word "substantive" in the same way the APA does—to identify only those legal standards that

have the "force and effect of law."

*First*, the Medicare Act contemplates that "statements of policy" like the one at issue here *can* establish or change a "*substantive* legal standard." 42 U. S. C. §1395hh(a)(2) (emphasis added). Yet, by definition under the APA, statements of policy are *not* substantive; instead they are grouped with and treated as interpretive rules. 5 U. S. C. §553(b)(A). This strongly suggests the Medicare Act just isn't using the word "substantive" in the same way as the APA. Even the government acknowledges that its contrary reading leaves the Medicare Act's treatment of policy statements "incoherent." Tr. of Oral Arg. 19.

To be sure, the government suggests that the statutory incoherence produced by its reading turns out to serve a rational purpose: It clarifies that the agency overseeing Medicare can't evade its notice-and-comment obligations for new rules that bear the "force and effect" of law by the simple expedient of "call[ing]" them mere "statements of policy." *Id.*, at 19–20. The dissent echoes this argument, suggesting that Congress included "statements of policy" in §1395hh(a)(2) in order to capture "substantive rules in disguise." *Post*, at 5 (opinion of BREYER, J.).

But the statute doesn't refer to things that are *labeled* or *disguised* as statements of policy; it just refers to "statements of policy." Everyone agrees that when Congress used that phrase in the APA and in other provisions of §1395hh, it referred to things that *really are* statements of policy. See, *e.g.*, *Pacific Gas & Elec. Co.* v. *Federal Power Comm'n*, 506 F. 2d 33, 38 (CADC 1974); *post*, at 4–5 (discussing §1395hh(e)(1)). Yet, to accept the government's view, we'd have to hold that when Congress used the very same phrase in §1395hh(a)(2), it sought to refer to things an agency *calls* statements of policy but that *in fact* are nothing of the sort. The dissent admits this "may seem odd at first blush," *post*, at 5, but further blushes don't bring much improvement. This Court does not lightly

assume that Congress silently attaches different meanings
to the same term in the same or related statutes. See *Law*
v. *Siegel*, 571 U. S. 415, 422 (2014).

Besides, even if the statute's reference to "statements of
policy" could bear such an odd construction, the govern-
ment and the dissent fail to explain why Congress would
have thought it necessary or appropriate. Agencies have
never been able to avoid notice and comment simply by
mislabeling their substantive pronouncements. On the
contrary, courts have long looked to the *contents* of the
agency's action, not the agency's self-serving *label*, when
deciding whether statutory notice-and-comment demands
apply. See, *e.g.*, *General Motors Corp.* v. *Ruckelshaus*, 742
F. 2d 1561, 1565 (CADC 1984) (en banc) ("[T]he agency's
own label, while relevant, is not dispositive"); *Guardian
Fed. Sav. & Loan Assn.* v. *Federal Sav. & Loan Ins. Corp.*,
589 F. 2d 658, 666–667 (CADC 1978) (if "a so-called policy
statement is in purpose or likely effect . . . a binding rule
of substantive law," it "will be taken for what it is"). Nor
is there any evidence before us suggesting that Congress
thought it important to underscore this prosaic point in
the Medicare Act (and yet not in the APA)—let alone any
reason to think Congress would have sought to make the
point in such an admittedly incoherent way.

*Second*, the government's reading would introduce
another incoherence into the Medicare statute. Subsection
(e)(1) of §1395hh gives the government limited authority
to make retroactive "substantive change[s]" in, among
other things, "interpretative rules" and "statements of
policy." But this statutory authority would make no sense
if the Medicare Act used the term "substantive" as the
APA does. It wouldn't because, again, interpretive rules
and statements of policy—and any changes to them—are
*not* substantive under the APA by definition.

Here, too, the government offers no satisfactory reply.
It concedes, as it must, that the term "substantive" in

subsection (e)(1) can't carry the meaning it wishes to ascribe to the same word in subsection (a)(2). Tr. of Oral Arg. 16–18. So that leaves the government to suggest (again) that the same word should mean two different things in the same statute. In (e)(1), the government says, it may bear the meaning the hospitals propose, but in (a)(2) it means the same thing it does in the APA. But, once more, the government fails to offer any good reason or evidence to unseat our normal presumption that, when Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout. See *Law*, 571 U. S., at 422.

*Third*, the government suggests Congress used the phrase "substantive legal standard" in the Medicare Act as a way to exempt interpretive rules and policy statements from notice and comment. But Congress had before it— and rejected—a much more direct path to that destination. In a single sentence the APA sets forth two exemptions from the government's usual notice-and-comment obligations:

> "Except when notice or hearing is required by statute, this subsection [requiring notice and comment] does not apply—
>
>   "(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
>
>   "(B) when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U. S. C. §553(b).

In the Medicare Act, Congress expressly borrowed *one* of the APA's exemptions, the good cause exemption, by cross-referencing it in §1395hh(b)(2)(C). If, as the government supposes, Congress had also wanted to borrow the *other* APA exemption, for interpretive rules and policy state-

ments, it could have easily cross-referenced that exemption in exactly the same way.  Congress had recently done just that, cross-referencing both of the APA's exceptions in the Clean Air Act.  See §305(a), 91 Stat. 772, 42 U. S. C. §7607(d)(1).  Yet it didn't do the same thing in the Medicare Act, and Congress's choice to include a cross-reference to one but not the other of the APA's neighboring exemptions strongly suggests it acted "'intentionally and purposefully in the disparate'" decisions.  *Russello* v. *United States*, 464 U. S. 16, 23 (1983).

The government's response asks us to favor a most unlikely reading over this obvious one.  The government submits that Congress simply preferred to mimic the APA's interpretive-rule exemption in the Medicare Act by using the novel and enigmatic phrase "substantive legal standard" instead of a simple cross-reference.  But the government supplies no persuasive account why Congress would have thought it necessary or wise to proceed in this convoluted way.  The dissent suggests that a cross-reference could not have taken the place of *other* language in §1395hh(a)(2) limiting the notice-and-comment requirement to rules governing benefits, payment, or eligibility, *post*, at 17; but we can't see why this would have made a cross-reference less desirable than the phrase "substantive legal standard" as a means of incorporating the APA's interpretive-rule exemption.  So we're left with nothing but the doubtful proposition that Congress sought to accomplish in a "surpassingly strange manner" what it could have accomplished in a much more straightforward way.  *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. 639, 647 (2012); see *Advocate Health Care Network* v. *Stapleton*, 581 U. S. ___, ___ (2017) (slip op., at 8) ("When legislators did not adopt 'obvious alternative' language, 'the natural implication is that they did not intend' the alternative").

The dissent would have us disregard all of the textual

clues we've found significant because the word "substantive" carried "a special meaning in the context of administrative law" in the 1980s, making it "almost a certainty" that Congress had that meaning in mind when it used the word "substantive" in §1395hh(a)(2). *Post*, at 3, 8. But it was the phrase "substantive *rule*" that was a term of art in administrative law, and Congress chose *not* to use that term in the Medicare Act. Instead, it introduced a seemingly new phrase to the statute books when it spoke of "substantive *legal standards*." And, for all the reasons we have already explored, the term "substantive legal standard" in the Medicare Act appears to carry a more expansive scope than that borne by the term "substantive rule" under the APA.

In reply, the dissent stresses that §1395hh refers to agency actions requiring notice and comment as "regulations." This is significant, the dissent says, because "courts had sometimes treated [the term 'regulations'] as interchangeable with the term 'substantive rules'" around the time of the 1987 Medicare Act amendments. *Post*, at 4. So if only "regulations" must proceed through notice and comment, the dissent reasons, that necessarily encompasses only things that qualify as substantive rules under the APA. In fact, however, by 1987 courts had commonly referred to *both* substantive and interpretive rules as "regulations," so the dissent's logical syllogism fails on its own terms. To see this, one need look no further than *Chrysler Corp.* v. *Brown*, 441 U. S. 281 (1979), which described the substantive-interpretive divide as "the central distinction *among agency regulations* found in the APA." *Id.*, at 301 (emphasis added); see also, *e.g.*, *Batterton* v. *Francis*, 432 U. S. 416, 425, n. 9 (1977) (distinguishing between "[l]egislative, or substantive, regulations" and "interpretative regulation[s]"); *United Technologies Corp.* v. *EPA*, 821 F. 2d 714, 719 (CADC 1987) ("most of the

regulations at issue are . . . interpretative").[1]

In the end, all of the available evidence persuades us that the phrase "substantive legal standard," which appears in §13955hh(a)(2) and apparently nowhere else in the U. S. Code, cannot bear the same construction as the term "substantive rule" in the APA. We need not, however, go so far as to say that the hospitals' interpretation, adopted by the court of appeals, is correct in every particular. To affirm the judgment before us, it is enough to say the government's arguments for reversal fail to withstand scrutiny. Other questions about the statute's meaning can await other cases. The dissent would like us to provide more guidance, *post*, at 13–14, but the briefing before us focused on the issue whether the Medicare Act borrows the APA's interpretive-rule exception, and we limit our holding accordingly. In doing so, we follow the well-worn path of declining "to issue a sweeping ruling when a narrow one will do." *McWilliams* v. *Dunn*, 582 U. S. ___, ___ (2017) (slip op., at 14).[2]

---

[1] Nor does §1395hh(e)(1) imply that the statute is using "regulations" and "interpretative rules" to mean different things. *Post*, at 4–5. True, that provision refers to "regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability." But contrary to the dissent's suggestion that each item in the list "refers to something different," *post*, at 5, the items appear to have substantial overlap. For example, many manual instructions surely qualify as guidelines of general applicability; and, as explained above, the statute explicitly requires some statements of policy to be issued as regulations.

[2] Nor is it obvious that the dissent's approach would provide significantly clearer guidance. Lower courts have often observed "that it is quite difficult to distinguish between substantive and interpretative rules," *Syncor Int'l Corp.* v. *Shalala*, 127 F. 3d 90, 93 (CADC 1997), and precisely where to draw the boundary has been a subject "of much scholarly and judicial debate," *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, ___ (2015) (slip op., at 3).

### III

Unable to muster support for its position in the statutory text or structure, the government encourages us to look elsewhere. It begins by inviting us to follow it into the legislative history lurking behind the Medicare Act. "But legislative history is not the law." *Epic Systems Corp.* v. *Lewis*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 23). And even those of us who believe that clear legislative history can "illuminate ambiguous text" won't allow "ambiguous legislative history to muddy clear statutory language." *Milner* v. *Department of Navy*, 562 U. S. 562, 572 (2011). Yet the text before us clearly forecloses the government's position in this case, and the legislative history presented to us is ambiguous at best.

The government points us first to a conference report on the 1986 bill that adopted §1395hh(b). The 1986 report opined that the bill adopted at that time wouldn't require notice and comment for interpretive rules. See H. R. Conf. Rep. No. 99–1012, p. 311 (1986). But the 1986 bill didn't include the statutory language at issue here. Congress added *that* language only the following year, when it enacted §1395hh(a)(2). Nor does the government try to explain how a report on a 1986 bill sheds light on the meaning of statutory terms first introduced in 1987. If anything, the fact that Congress revisited the statute in 1987 may suggest it wasn't satisfied with the 1986 notice-and-comment requirements and wished to enhance them. Some legislative history even says as much. See H. R. Rep. No. 100–391(I), p. 430 (1987) (expressing concern that, despite the 1986 legislation, the agency was still announcing "important policies" without notice and comment).

The conference report on the 1987 bill that *did* adopt the statutory language before us today doesn't offer much help to the government either. The House version of the bill would have required notice and comment for rules with a

"significant effect" on payments, a condition no doubt present here. H. R. 3545, 100th Cong., 1st Sess., reprinted in 133 Cong. Rec. 30019. Later, the conference committee replaced the House's language with the current language of subsection (a)(2), which the report said "reflect[ed] recent court rulings." H. R. Conf. Rep. No. 100–495, p. 566 (1987). The government contends that this was an oblique reference to a then-recent decision discussing the APA's interpretive-rule exception and an implicit suggestion that interpretive rules shouldn't be subject to notice and comment. See *American Hospital Assn.* v. *Bowen*, 834 F. 2d 1037, 1045–1046 (CADC 1987). But, as the hospitals point out, *Bowen* was mostly about the APA's treatment of *procedural* rules. See *id.*, at 1047–1057. So it seems at least equally plausible that the conference committee revised the House's language because it feared that language would have subjected procedural rules to notice-and-comment obligations.

The hospitals call our attention to other indications, too, that Members of Congress didn't understand the conference's language to track the APA. For example, the relevant provision in the final bill was titled "Publication as Regulations of *Significant Policies*." §4035(b), 101 Stat. 1330–78 (emphasis added). And, as we've seen, "significant policies" don't always amount to substantive rules under the APA. The House Ways and Means Committee likewise described the final bill as requiring notice and comment for "[s]ignificant policy changes," not just substantive rules. Summary of Conference Agreement on Reconciliation Provisions Within the Jurisdiction of the Committee on Ways and Means, 100th Cong., 1st Sess., 12–13 (Comm. Print 1987). So in the end and at most, we are left with exactly the kind of murky legislative history that we all agree can't overcome a statute's clear text and structure.

That leads us to the government's final redoubt: a policy

argument. But as the government knows well, courts aren't free to rewrite clear statutes under the banner of our own policy concerns. If the government doesn't like Congress's notice-and-comment policy choices, it must take its complaints there. See, *e.g.*, *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. \_\_\_, \_\_\_–\_\_\_ (2017) (slip op., at 9–10); *Sebelius* v. *Cloer*, 569 U. S. 369, 381 (2013). Besides, the government's policy arguments don't carry much force even on their own terms. The government warns that providing the public with notice and a chance to comment on all Medicare interpretive rules, like those in its roughly 6,000-page "Provider Reimbursement Manual," would take "'many years'" to complete. Brief for Petitioner 18, 42. But the dissent points to only *eight* manual provisions that courts have deemed interpretive over the last four decades, see *post*, at 10–12, and the government hasn't suggested that providing notice and comment for these or any other specific manual provisions would prove excessively burdensome. Nor has the government identified any court decision invalidating a manual provision under §1395hh(a)(2) in the nearly two years since the court of appeals issued its opinion in this case. For their part, the hospitals claim that only a few dozen pages of the Provider Reimbursement Manual might even arguably require notice and comment. Tr. of Oral Arg. 49–51. And they tell us that the agency regularly and without much difficulty undertakes notice-and-comment rulemaking for many other decisions affecting the Medicare program. See Brief for Respondents 58; App. to Brief in Opposition 1a–3a. The government hasn't rebutted any of these points.

Not only has the government failed to document any draconian costs associated with notice and comment, it also has neglected to acknowledge the potential countervailing benefits. Notice and comment gives affected parties fair warning of potential changes in the law and an

opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision. See 1 K. Hickman & R. Pierce, Administrative Law §4.8 (6th ed. 2019). Surely a rational Congress could have thought those benefits especially valuable when it comes to a program where even minor changes to the agency's approach can impact millions of people and billions of dollars in ways that are not always easy for regulators to anticipate. None of this is to say Congress *had* to proceed as it did. It is only to say that Congress reasonably could have believed that the policy decision reflected in the statute would yield benefits sufficient to outweigh the speculative burdens the government has suggested. And if notice and comment really does threaten to "become a major roadblock to the implementation of" Medicare, *post*, at 10, the agency can seek relief from Congress, which—unlike the courts—is both qualified and constitutionally entitled to weigh the costs and benefits of different approaches and make the necessary policy judgment.

IV

There are two more lines of argument that deserve brief acknowledgment. One concerns §1395hh(a)(4), which provides that a Medicare regulation struck down for not being a logical outgrowth of the government's proposal can't "take effect" until the agency provides a "further opportunity for public comment." The hospitals claim, and the court of appeals held, that subsection (a)(4) also and independently required notice and comment here. But given our holding affirming the court of appeals' judgment under §1395hh(a)(2), we have no need to reach this question.

Separately, we can imagine that the government might have sought to argue that the policy at issue here didn't "establis[h] or chang[e]" a substantive legal standard—and

so didn't require notice and comment under §1395hh(a)(2)—because the *statute* itself required it to count Part C patients in the Medicare fraction. But we need not consider this argument either, this time because the government hasn't pursued it and we normally have no obligation to entertain grounds for reversal that a party hasn't presented. Far from suggesting that the Medicare Act supplies the controlling legal standard for determining whether to count Part C patients, the government has insisted that the statute "does not speak directly to the issue," Brief for Appellant in *Northeast Hospital Corp.* v. *Sebelius*, No. 10–5163 (CADC), p. 22, and thus leaves a "'gap'" for the agency to fill, Brief for Appellee in *Allina* v. *Price*, No. 16–5255 (CADC), p. 50 (quoting *Northeast Hospital Corp.*, 657 F. 3d, at 13). The courts below accepted the government's submission, and the government hasn't sought to take a different position in this Court. So we express no opinion on whether the statute in fact contains such a "gap." We hold simply that, when the government establishes or changes an avowedly "gap"-filling policy, it can't evade its notice-and-comment obligations under §1395hh(a)(2) on the strength of the arguments it has advanced in this case.

\*

The judgment of the court of appeals is

*Affirmed.*

JUSTICE KAVANAUGH took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–1484

_____

## ALEX M. AZAR, II, SECRETARY OF HEALTH AND HUMAN SERVICES, PETITIONER *v.* ALLINA HEALTH SERVICES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 3, 2019]

JUSTICE BREYER, dissenting.

The statute before us, a subsection of the Medicare Act, refers to a "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard." 42 U. S. C. §1395hh(a)(2). This phrase is nested within a set of provisions that, taken together, require the Secretary of Health and Human Services to use notice-and-comment rulemaking before promulgating "regulations."

The Government argues that the language at issue, like the notice-and-comment provisions of the Administrative Procedure Act (APA), applies only to "substantive" or "legislative" rules. In its view, the language does not cover "interpretive" rules (which it believes the agency promulgated here). After considering the relevant language, the statutory context, the statutory history, and the related consequences, I believe the Government is right. I would remand this case to the Court of Appeals to consider whether the agency determination at issue in this case is a substantive rule (which requires notice and comment) or an interpretive rule (which does not).

## I

The arguments in support of my interpretation are

simple. By using words with meanings that are well settled in the APA context, Congress made clear that the notice-and-comment requirement in the Medicare Act applies only to substantive, not interpretive, rules. The statutory language, at minimum, permits this interpretation, and the statute's history and the practical consequences provide further evidence that Congress had only substantive rules in mind. Importantly, this interpretation of the statute, unlike the Court's, provides a familiar and readily administrable way for the agency to distinguish the actions that require notice and comment from the actions that do not.

### A

I begin with the specific language of the statute. There are, in my view, three relevant subsections that must be read together. The first, a general provision, has been part of the Medicare Act since Congress created the program in 1965. It says that the Secretary "shall prescribe such *regulations* as may be necessary to carry out the administration of the insurance programs." 42 U. S. C. §1395hh(a)(1) (emphasis added).

The other two relevant provisions were added in the 1980s. The provision contained in the very next paragraph is the one directly at issue here. It says:

> "No rule, requirement, or other statement of policy . . . that establishes or changes a *substantive* legal standard governing the scope of benefits, the payment for services, or the eligibility . . . to furnish or receive services or benefits . . . shall take effect unless it is promulgated by the Secretary by *regulation* under paragraph (1)." §1395hh(a)(2) (emphasis added).

And the third relevant provision, eight paragraphs away, contains the notice-and-comment requirement:

> "[B]efore issuing in final form *any regulation* under

subsection (a) . . . , the Secretary shall provide for no-
tice of the proposed *regulation* in the Federal Register
and a period of not less than 60 days for public com-
ment thereon." §1395hh(b)(1) (emphasis added).

Taken together, these provisions say that the Secretary
must use notice-and-comment procedures before promul-
gating any "regulation," and that a "rule, requirement,
or other statement of policy" counts as a "regulation"
whenever it "establishes or changes a substantive legal
standard."

The question at hand is whether an interpretive rule
qualifies as the type of "regulation" that Congress intended
to subject to the notice-and-comment requirement when it
added the second and third provisions in the 1980s. In my
view, the answer is no.

In the 1980s, the words "regulation" and "substantive"
(which I have repeatedly italicized above) carried a special
meaning in the context of administrative law. This Court
had recognized the "central distinction" drawn by the APA
between "'substantive rules' on the one hand and 'inter-
pretative rules, general statements of policy, or rules of
agency organization, procedure, or practice' on the other."
*Chrysler Corp.* v. *Brown*, 441 U. S. 281, 301 (1979). A
"substantive rule," often promulgated pursuant to specific
statutory authority, is a rule that "'bind[s]'" the public or
has "'the force and effect of law.'" *Id.*, at 301−302. Sub-
stantive rules had also come to be known as "legislative
rules." *Id.,* at 302. And some courts referred to substan-
tive rules as "regulations" as well, see, *e.g., American
Hospital Assn.* v. *Bowen*, 834 F. 2d 1037, 1045 (CADC
1987) ("'"regulations," "substantive rules," or "legislative
rules" are those which create law'"); *Cabais* v. *Egger*, 690
F. 2d 234, 238 (CADC 1982) (same), although this practice
was both less common and less consistent.

By way of contrast, courts had held that "interpretive

rules" do not have the "force and effect of law"; they simply set forth the agency's interpretation of the statutes or regulations that it administers. *Chrysler Corp.,* 441 U. S., at 302, and n. 31; see also *American Hospital Assn.*, 834 F. 2d, at 1045 (interpretive rules "merely clarify or explain existing law or regulations"). Then, as today, whether a rule was substantive or interpretive determined whether it had to be promulgated using the APA's notice-and-comment rulemaking procedures. 5 U. S. C. §553(b)(3)(A) (exempting "interpretative rules," among other things, from the notice-and-comment requirement); see also *Shalala* v. *Guernsey Memorial Hospital*, 514 U. S. 87, 99 (1995) ("Interpretive rules do not require notice and comment").

At this point, we can begin to see support in the statutory language for the Government's interpretation of the notice-and-comment provisions—one that excludes interpretive rules from their scope. By applying the statute only to agency actions that "*establish or change a substantive legal standard,*" §1395hh(a)(2) (emphasis added), Congress used words that courts had long used to describe substantive rules under the APA. See, *e.g., American Hospital Assn.*, 834 F. 2d, at 1045, 1046 ("'substantive rules'" are rules that "'create law'" or "'establis[h] a standard of conduct which has the force of law'"); *Linoz* v. *Heckler*, 800 F. 2d 871, 877 (CA9 1986) (substantive rules "'effect a change in existing law or policy'"). Moreover, by limiting the notice-and-comment requirement to "*regulation*[*s*]," §1395hh(b)(1) (emphasis added), Congress used a word that courts had sometimes treated as interchangeable with the term "substantive rules."

Another subsection of the statute, §1395hh(e)(1), similarly implies that Congress had only substantive rules in mind when it used the term "regulations." That subsection bars the agency from retroactively applying certain policy changes articulated in "regulations, manual instruc-

tions, interpretative rules, statements of policy, or guidelines of general applicability." *Ibid.* By using the word "or" to connect "regulations" and the other words in the list, Congress suggested that each linked phrase refers to something different. This textual distinction between "regulations" and "interpretive rules" further suggests that the "regulations" that must go through notice and comment do not include interpretive rules.

There is, however, an important counterargument. As the Court emphasizes, *ante,* at 7−8, the provision before us includes the words "statement[s] of policy." §1395hh(a)(2). Even if we can easily read the words "rule[s]" and "requirement[s]" as referring to substantive or legislative rules, "statement[s] of policy" are a different matter. *Ibid.* Indeed, the APA explicitly excludes "statements of policy" from its notice-and-comment requirements. 5 U. S. C. §553(d)(2). So how can we say that our provision—which explicitly *includes* statements of policy—encompasses only those legislative rules that the APA subjects to notice-and-comment rulemaking?

The answer to this question linguistically is that our provision does not include *all* "statements of policy," but rather only those that are, in effect, substantive rules. That is because the statute does not "just refe[r] to 'statements of policy,'" *ante,* at 7; it refers to "statement[s] of policy . . . *that establis[h] or chang[e] a substantive legal standard*," §1395hh(a)(2) (emphasis added). Those words, read together, are simply another way of referring to substantive rules in disguise. This reading may seem odd at first blush, but the statutory history and the consequences of the alternative interpretation persuade me that this is precisely what Congress intended.

## B

I turn next to the history of the statute, which provides significant support for believing that the Medicare rule-

making provision does not extend to interpretive rules. As enacted in 1965, the Medicare Act authorized the agency to promulgate "regulations" as necessary, but did not require the agency to follow any particular rulemaking procedures. See §102(a), 79 Stat. 331. The APA's notice-and-comment requirements did not apply to Medicare regulations, for the APA specifically exempts "matter[s] relating to . . . benefits" from its scope. 5 U. S. C. §553(a)(2).

In 1971, the agency nonetheless adopted a policy of voluntarily promulgating most regulations through notice-and-comment rulemaking. See Public Participation in Rule Making, 36 Fed. Reg. 2532. But the agency did not use notice and comment for *all* policy decisions during this time. It also provided extensive guidance to participants in the Medicare system through less formal means like manuals (a practice it still follows today). See, *e.g.*, *Daughters of Miriam Ctr. for the Aged* v. *Mathews*, 590 F. 2d 1250, 1254 (CA3 1978) (describing the agency's Provider Reimbursement Manual, which "interprets and elaborates upon" Medicare regulations).

In the early 1980s, the agency proposed to change its notice-and-comment policy: It no longer intended to use notice and comment when the disadvantages of doing so "outweigh[ed] the benefits of receiving public comment." Administrative Practice and Procedures, 47 Fed. Reg. 26860 (1982). This announcement provoked widespread opposition. Citizens' groups and others asked Congress to "make it clear, *by statute*, that Medicare regulations . . . should be subject to" the APA. Medicare Appeals Provisions: Hearing on S. 1158 before the Subcommittee on Health of the Senate Committee on Finance, 99th Cong., 1st Sess., 62 (1985). In 1986, Congress responded to these requests by enacting a provision that required public notice and a 60-day comment period for "any regulation," with a few exceptions. See 42 U. S. C. §1395hh (1982 ed.,

Supp. IV); §9321(e)(1), 100 Stat. 2017.

Congress meant the term "regulation" to include only substantive or legislative rules. As I have said, *supra,* at 3, at the time Congress wrote the notice-and-comment provision in the 1980s, courts sometimes used all three terms interchangeably. See, *e.g., Cabais*, 690 F. 2d, at 238. And the legislative history confirms that Congress expected the APA principles to apply. The House-Senate Conference Report stated that the 1986 notice-and-comment provision would *not* require rulemaking for "items (such as interpretive rules, general statements of policy, or rules of agency organization, procedure or practice) that are not currently subject to that requirement." H. R. Conf. Rep. No. 99–1012, p. 311.

As of 1986, then, it was clear that the Medicare Act required notice-and-comment rulemaking only for substantive rules, not for interpretive rules. That was true even though the Medicare Act did not expressly cross-reference the APA's exception for interpretive rules. Instead, Congress simply understood that the statutory term "regulation" excluded interpretive rules, statements of policy, and the like.

Now I shall turn to the subsection before us, a provision enacted one year later. Did that provision, enacted in 1987, significantly change the scope of the Medicare Act's notice-and-comment requirement? The House of Representatives passed a version of the provision that seemed to say yes. The House Report on that bill said that the provision arose from a "concer[n] that *important policies* [were] being developed without benefit of the public notice and comment period and, with growing frequency, [were] being transmitted, if at all, through manual instructions and other informal means." H. R. Rep. No. 100−391, pt. 1, p. 430 (emphasis added). Thus, the House bill required notice and comment for *any* "rule, requirement, or other statement of policy . . . that *has (or may have) a significant*

*effect* on the scope of benefits, the payment for services, or the eligibility" for benefits or services. H. R. 3545, 100th Cong., 1st Sess., §4073(a)(2) (1987), 133 Cong. Rec. 30019.

The Senate, however, thought the scope of this language was too broad. And the House-Senate Conference Committee agreed with the Senate, not the House. It revised the House version by taking out the words *"has (or may have) a significant effect* on the scope of" benefits, payment, or eligibility, and by substituting for those words the current language—namely, *"establishes or changes a substantive legal standard* governing the scope of" benefits, payment, or eligibility. §1395hh(a)(2) (emphasis added); see §4035(b), 101 Stat. 1330−78 (1987); H. R. Conf. Rep. No. 100–495, p. 566 (1987). The revised language thus focused on the *legal effect* of the agency decision, not its practical importance.

The Conference Report explains that the Committee substituted its language for that of the House in order to "reflec[t] recent court rulings." *Ibid.* What were those "court rulings"? I have described many of them above. See *supra,* at 3−4. Among others, they included rulings describing "substantive rules" as rules that "'establis[h] a standard of conduct which has the force of law'" or that change "substantive standards." *American Hospital Assn.*, 834 F. 2d, at 1046, 1056. Given this case law, it is almost a certainty that the Conference Committee had in mind the meaning that courts had already given to the term "substantive"; indeed, neither the Court nor the hospitals point to any other recent rulings to which the Report could have referred. And if that is correct, Congress would not have intended to include interpretive rules within the scope of the revised provision.

Then-recent court rulings also explain why Congress added the words "statement of policy," given its desire to mimic the scope of the APA's rulemaking provision. At the time Congress added this language in 1987, the D. C.

Circuit had recently described it as "well established that a court, in determining whether notice and comment procedures apply to an agency action, will consider the agency's own characterization of the particular action." *Telecommunications Research and Action Ctr.* v. *FCC*, 800 F. 2d 1181, 1186 (1986); see also *United Technologies Corp.* v. *EPA,* 821 F. 2d 714, 718 (CADC 1987) ("[T]he agency's characterization of a rule is 'relevant'"). And in practice, courts appeared to give the agency's characterization at least some weight. See *Telecommunications*, 800 F. 2d, at 1186 (finding "no reason to question the Commission's characterization" of the challenged action as a "policy statement"); *General Motors Corp.* v. *Ruckelshaus*, 742 F. 2d 1561, 1565 (CADC 1984) (en banc) (finding a rule exempt from notice and comment in part because "the agency regarded its rule as interpretative"). These cases thus reinforce the likelihood that Congress inserted the words "statement of policy" to make clear that the agency could not evade the notice-and-comment obligation simply by calling a substantive rule a "statement of policy." In deciding whether a particular agency action is (or is not) a substantive rule, it is the *substantive legal effect* that will matter*,* not the label.

In short, the statute's history provides considerable evidence that Congress intended to replicate the APA framework. Nowhere in this history is there any indication that Congress intended to require notice and comment for a *broader* category than substantive rules.

## C

The third—and perhaps strongest—reason for believing that Congress intended this interpretation is a practical reason. Medicare is a massive federal program, "embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations." *Shalala* v. *Illinois Council on Long Term Care, Inc.*, 529 U. S. 1, 13 (2000). To help

participants navigate the statutory and regulatory scheme, the agency has issued tens of thousands of pages of manual instructions, interpretive rules, and other guidance documents. And it has followed this practice since well before Congress enacted the notice-and-comment provisions at issue here. See *supra,* at 6.

This combination of regulations and informal guidance is, we have said, "a sensible structure for the complex Medicare reimbursement process." *Guernsey Memorial Hospital*, 514 U. S., at 101. Notice-and-comment procedures are elaborate and take time to complete. The Government cites a study showing that notice-and-comment rulemakings take an average of four years to complete. Pet. for Cert. 20 (citing GAO, D. Fantone, Federal Rulemaking 5, 19 (GAO–09–205, 2009)).

To imagine that Congress wanted the agency to use those procedures in respect to a large percentage of its Medicare guidance manuals is to believe that Congress intended to enact what could become a major roadblock to the implementation of the Medicare program. As the Government warns us, the Court of Appeals' interpretation may "substantially undermine" and even "cripple" the administration of the Medicare scheme. See Brief for Petitioner 21, 42. To illustrate this point, consider the following provisions of the Medicare Provider Reimbursement Manual, which the agency has published for decades. All of these provisions were held by courts to be "interpretive rules," and hence not subject—before today—to the statute's notice-and-comment requirements:

- Provisions governing when provider contributions to employee deferred compensation plans are necessary and proper and therefore reimbursable. *Visiting Nurse Assn. Gregoria Auffant, Inc.* v. *Thompson*, 447 F. 3d 68, 76−77 (CA1 2006).

- Provisions governing exceptions to the per diem cost limits that the Secretary can authorize in respect to routine extended care service costs. *St. Francis Health Care Centre* v. *Shalala*, 205 F. 3d 937, 940−943, 947 (CA6 2000).

- A provision governing whether certain hospital costs should be classified as "routine" or "ancillary." *National Med. Enterprises, Inc.* v. *Shalala*, 43 F. 3d 691, 694 (CADC 1995).

- A provision governing whether borrowing is considered "necessary" when the provider has funds in its funded depreciation account that are not committed by contract to a capital purpose. *Sentara-Hampton Gen. Hospital* v. *Sullivan*, 980 F. 2d 749, 751, 756−760 (CADC 1992).

- A provision restricting the type of financial arrangements for which hospitals can recover reimbursement for on-call emergency room physicians. *Samaritan Health Serv.* v. *Bowen*, 811 F. 2d 1524, 1525, 1529 (CADC 1987).

- A provision regarding the recapture of excess reimbursements resulting from a provider depreciating its assets using an accelerated method. *Daughters of Miriam Ctr.*, 590 F. 2d, at 1254–1255.

- A provision governing whether providers are entitled to reimbursement for bad debts when States are obligated to pay those debts under Medicaid. *GCI Health Care Ctrs., Inc.* v. *Thompson*, 209 F. Supp. 2d 63, 68−69 (DC 2002).

- A provision disallowing reimbursement of stock

maintenance costs. *American Medical Int'l, Inc.* v. *Secretary of Health, Education and Welfare*, 466 F. Supp. 605, 615−616 (DC 1979).

These examples all involve provisions of the Provider Reimbursement Manual, but the agency also publishes more than a dozen other manuals, with tens of thousands of additional pages of instructions governing "the scope of benefits, the payment for services, [and] the eligibility" for benefits or services. §1395hh(a)(2). These include the Medicare General Information, Eligibility and Entitlement Manual; the Medicare Claims Processing Manual; the Medicare Benefit Policy Manual; the Medicare Secondary Payer Manual; the Medicare Program Integrity Manual; the Medicare Prescription Drug Benefit Manual; and many others. Many provisions of these manuals have been deemed interpretive rules as well. See, *e.g., Erringer* v. *Thompson*, 371 F. 3d 625, 632 (CA9 2004) (provisions of Program Integrity Manual governing contractors' creation of local coverage determinations); *Linoz*, 800 F. 2d, at 876–878 (provision of Carrier's Manual carving out an exception to the rule governing reimbursement for ambulance service).

Is it reasonable to believe that Congress intended to impose notice-and-comment requirements upon all, or most, or even many of these rules, requirements, or statements of policy? See *ante,* at 16. In my view, the answer is clearly no. Yet the Court's opinion might impose this unnecessary and potentially severe burden on the administration of the Medicare scheme.

D

Finally, interpreting the statute as replicating the APA has the added virtues of clarity and stability. We know that Congress could not have meant to require notice-and-comment rulemaking for *all* agency actions that could

conceivably affect substantive Medicare policy. So there must be a way to distinguish the "substantive" rules that are covered from the "substantive" rules that are not. And the APA's notion of a "substantive rule" provides a natural, legally understandable, and customary way for judges, agencies, and lawyers to perform that task. In that sense, the APA offers us a familiar port in an interpretive storm.

The Court not only leaves the APA behind; it fails to substitute any reasonably clear alternative standard. How is the agency to determine whether a rule "establishes or changes a substantive legal standard"? At one point, the Court refers to the hospitals' view that the statute applies to agency actions "that 'creat[e] duties, rights and obligations,' as distinct from [agency actions] that specif[y] how those duties, rights, and obligations should be enforced." *Ante,* at 6. But it later declines to "go so far as" to fully endorse that view. *Ante,* at 12.

At another point, the Court refers to the notice-and-comment requirement as applying to "avowedly 'gap'-filling polic[ies]," suggesting the case might be different if the Government had argued that "the *statute* itself" "supplie[d] the controlling legal standard." *Ante*, at 16−17. But these statements sound as if the Court is embracing the very interpretive-rule exception that its holding denies. See, *e.g.*, *Hemp Industries Assn.* v. *DEA*, 333 F. 3d 1082, 1087 (CA9 2003) (interpretive rules "merely explain, but do not add to, the substantive law that already exists in the form of a statute"); *American Hospital Assn.*, 834 F. 2d, at 1046 (agency action is interpretive where it "merely reminds parties of existing duties" under a statute); cf. *Clarian Health West, LLC* v. *Hargan*, 878 F. 3d 346, 355−356 (CADC 2017) (concluding, after the decision below, that manual instructions governing reconciliation of outlier payments did not require notice and comment because they did not "bind" the agency and because existing statutory and regulatory provisions "establish[ed the]

substantive legal standards"). If the Court is going to effectively exempt interpretive rules from the notice-and-comment requirement, why not simply say so?

Nor does the Court's resolution of this particular case offer clarity as to the scope of the statute. The Court holds that the agency must provide notice and comment before including Medicare Part C patients in the Medicare fraction. But it does not *explain* why that agency decision "establishes or changes a substantive legal standard." Is it because the decision "affects a hospital's right to payment"? *Ante,* at 6. Is it because the decision's financial impact is "considerabl[e]"? *Ante,* at 3−4. Is it because the agency had previously sought to adopt the same policy through notice and comment? *Ante,* at 4. The Court does not say.

This lack of explanation aggravates the potential burden that the Court's opinion already imposes upon the Medicare program. It may also lead to legal challenges to the validity of interpretive rules (or even procedural rules) previously thought to have been settled. And it will thereby increase the confusion that is inevitable once the Court rejects the settled and readily available principles that courts have learned to use to identify substantive rules under the APA. These potential adverse consequences are, in my view, persuasive evidence that Congress did not intend the statute to be construed in this way.

To consider these consequences in no way invades Congress' constitutional authority to "weigh the costs and benefits of different approaches and make the necessary policy judgment." *Ante,* at 16. Congress exercised that authority when it passed the Medicare Act's notice-and-comment provisions. But it used language that even the Court describes as "enigmatic," *ante,* at 10, and our role as judges is to decipher that enigma. Examining the potential consequences of each competing interpretation helps us perform that task, as we can presume that Congress

did not intend to produce irrational or undesirable practical consequences. See *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 568 U. S. 519, 538, 544−545 (2013) (concluding that Congress did not intend an interpretation of the copyright statute that would produce serious and extensive "practical problems"); cf. *Home Depot U. S. A., Inc.* v. *Jackson*, *ante,* at \_\_\_ (ALITO, J., dissenting) (slip op., at 8) ("[A] good interpreter also reads a text charitably, not lightly ascribing irrationality to its author").

## II

The reasons set forth above provide sufficient grounds to believe that Congress only intended to require notice and comment for substantive rules. The Court nonetheless concludes that three "textual clues" foreclose this interpretation. *Ante,* at 10−11. I have already mentioned one of them: Congress' use of the words "statement of policy" in the provision before us. As I have explained, the most plausible explanation for this language is that Congress sought to make clear that the agency must use notice and comment for any agency pronouncement that amounts to a substantive rule—irrespective of the label that the agency applies. See *supra*, at 8−9.

The remaining two arguments that the Court offers to defend its interpretation are, in my view, similarly inadequate. The Court points, for example, to §1395hh(e)(1), which Congress added in 2003. See §903(a)(1), 117 Stat. 2376. That subsection limits the agency's authority to make retroactive any "substantive change" in "regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability." The Court points out that the word "substantive" in this subsection does not mean a "substantive rule" under the APA. *Ante*, at 8−9. And I agree with that observation. But I cannot see how that fact sheds light on the meaning of the phrase "establishes or changes a *substantive legal standard*,"

where the adjective "substantive" modifies an entirely different noun.

We of course normally *presume* that the same word carries a single meaning throughout a given statute. Here, however, that presumption is overcome. The word "substantive" in §1395hh(e)(1) modifies the word "change," and the phrase "substantive change" has a known meaning in the law. It refers to a change to the *substance* of a rule, rather than a technical change to its form. See, *e.g., Northwest, Inc.* v. *Ginsberg*, 572 U. S. 273, 282 (2014) (noting that statutory recodification "did not effect any 'substantive change'" to the law); see also Black's Law Dictionary 1469 (8th ed. 2004) (defining "substance" as, *inter alia,* "the essential quality of something, *as opposed to its mere form*" (emphasis added)). Thus, §1395hh(e)(1) simply says that the agency cannot retroactively apply nontechnical changes made to policies articulated in "regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability." The provision before us deals with an entirely different subject, namely, the use of notice-and-comment procedures. And the word "substantive" in this context has a different and significantly narrower scope.

The Court also points to the fact that the Medicare Act cross-references the APA's good-cause exception. Had Congress wanted to pick up the APA's exclusion of interpretive rules, the Court says, it could simply have cross-referenced the APA's interpretive-rule exception as well. *Ante,* at 9–10. As a practical matter, the legislative history suggests that the absence of a cross-reference is a particularly unreliable guide to congressional intent in this case. The initial version of the bill passed by the House of Representatives unambiguously sought to *broaden* the scope of the APA. See *supra,* at 7−8. Rather than starting anew, the Conference Committee retained some of the language from the House's version but revised it to reflect

the APA's notion of a substantive rule. See *ibid.*

Even putting the drafting history aside, there are many reasons why Congress might have chosen to spell out the governing standard rather than rest upon an explicit cross-reference to a portion of the APA. Section 1395hh(a)(2), for example, reflects Congress' judgment that rulemaking is necessary only for a certain subset of substantive rules—namely, those governing "the scope of benefits, the payment for services, or the eligibility" for benefits or services. A simple cross-reference to the APA's interpretive-rule exception would not have adequately captured this judgment. The APA's exception would have exempted interpretive rules, but Congress also wanted to exempt those substantive rules that do not govern benefits, payment, or eligibility. True, Congress could have produced the same result by first amending the statute to require notice-and-comment for any regulation governing benefits, payment, or eligibility and *then* cross-referencing the interpretive-rule exception. But the language of §1395hh(a)(2) accomplishes both of those tasks at once.

And even were that not so, there is no rule requiring Congress to use cross-references. As I have explained, the Medicare Act's notice-and-comment provisions already operate by way of three cross-linked subsections. See *supra*, at 2−3. Given the complexity of this scheme, I would not second-guess Congress' decision not to add yet another cross-reference here.

\*    \*    \*

Given the statute's context, its language, its history, and related practical consequences, I believe that Congress intended the provision before us to apply to all substantive rules, irrespective of the labels that the agency affixed. Congress did not, however, intend the provision to require notice and comment for interpretive rules that, by definition, lack the force and effect of law. I fear that the Court,

in rejecting this interpretation, has improperly (and need-lessly) "ignore[d] persuasive evidence of Congress' actual purpose." *West Virginia Univ. Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 115 (1991) (Stevens, J., dissenting); cf. *Johnson* v. *United States*, 163 F. 30, 32 (CA1 1908) (Holmes, J.) ("[I]t is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before").

If I am right, and if the Court's opinion will cause serious confusion or delay, Congress can, through legislation, fix the Court's mistake. "But legislative action takes time; Congress has much to do; and other matters . . . may warrant higher legislative priority." *Milner* v. *Department of Navy*, 562 U. S. 562, 592 (2011) (BREYER, J., dissenting). Rather than requiring Congress to "revisit the matter" and "restate its purpose in more precise English," *Casey*, 499 U. S., at 115 (Stevens, J., dissenting), I would hold that the Medicare Act only requires notice and comment for what this Court has traditionally considered to be substantive rules. I would remand for the Court of Appeals to decide in the first instance whether the agency's decision in this case qualifies as a substantive or an interpretive rule.

For these reasons, I respectfully dissent.